## SMITH v. STATE
(No. 1528; March 5, 1928; 274 Pac. 1074)

*R. L. DeNise* and *F. W. Johnson,* (*L. H. Brown* of counsel) for plaintiff in error.

*William O. Wilson,* Attorney General, and *Richard J. Jackson,* Assistant Attorney General, for defendant in error.

BLUME, Chief Justice.

Defendant was convicted of manslaughter, and he appeals.

Some time in November, 1926, a human skeleton was found in about the SW¼, Sec. 8, T. 26, R. 107, in the northern portion of Sweetwater County, Wyoming. Testi-

mony was introduced that it was that of one Rufino Urrutia, a sheepherder, hereinafter called the deceased, who mysteriously disappeared about the middle of October, 1923.

The saddle of the deceased and his slicker and a scabbard tied thereto were soon after his disappearance found in his sheep camp, and showed, apparently, considerable traces of fresh blood. The horse of deceased, hobbled, was found about three miles from the camp, and had, apparently, some blood on one of its front legs. A dentist identified the work done on the teeth of deceased. A hat, shown to have been that of deceased, and which apparently had a bullet hole, was found in the spring of 1924, by Earl Pulley, near the camp above mentioned. Two physicians testified that the skull found indicated that the deceased came to his death by a bullet, so that we may, for the purpose of this opinion at least, assume that the skeleton found was that of the deceased, and that he came to his death by violent means. A summary of the circumstances relied on by the state, which led to the arrest, trial and conviction of the defendant, is about as follows:

The deceased was working as a sheepherder for the Midland Live Stock Company at and prior to the time of his disappearance, and was in charge of a band of sheep. His sheep camp was located on the SW¼ of Sec. 9, T. 26, Range 107, about half a mile south of an old road called the "Old Emigrant Trail," which runs east and west, and connects with the "Big Piney Road" in Sec. 7, T. 26, R. 106, about four miles east of the sheep camp of deceased. The Big Piney road runs in southeasterly-northwesterly direction and branches off from the main highway—running north and south—between Rock Springs and Pinedale, in Sec. 22, T. 26, R. 106. Farson or "Eden Store" is located on the latter highway in Section 27, T. 25, R. 106, about six miles south from the point where the "Big Piney road" branches off as above mentioned. A creek called Big Sandy runs in a generally northerly direction, is east

of the highway to Pinedale and about eight miles east of the foregoing sheep camp. It seems that there are mountains east of the Big Sandy, which furnish the summer pasture for the sheep in that country. In the fall of the year, the mountains are abandoned, and the sheep are trailed westward. So the band of sheep of deceased, upon leaving the mountains, was led westward, across the Big Sandy, to the place above mentioned, and a camp was established there a day or two before October 10, 1923, by Joe Arambide, the camp-mover—for sheepherders do not themselves establish the camp, but do so through a camp-mover or camp-tender, who, frequently, as in this case, attends to more than one camp. A so-called "dry lake," which contained some water in October, 1923, was located in the NW¼, Sec. 15, and the NE¼, Sec. 16, T. 26, R. 107, and was about half a mile north from the camp of deceased, and slightly further east. The skeleton of deceased was found about one-half mile, or a little more, west and a little south of the foregoing camp.

Mike Smith, born in Texas, a Spanish war veteran, too, was a sheepherder in October, 1923, and was employed by William Dewey. Since 1903 he had been mostly in Wyoming and Montana, was employed in an oil field near Rock Springs for a year or so before he went to work for Dewey in June, 1923, and seemingly was known to a considerable number of people at and near Rock Springs, for some time prior to October, 1923. Dewey's sheep were trailed from the mountains and crossed the Big Sandy about October 1, 1923, and Roberts, Smith's camp-tender, established a camp for defendant about October 5th, 1923, in about Section 17, T. 26, R. 107, probably approximately two miles southwesterly from the camp of deceased, and about two miles west of "Dry Lake," as indicated by the map in evidence. There were other sheep camps in that neighborhood, but not as close. Two others were approximately five miles distant from that of deceased and others were somewhat further away. Earl Pulley and William Dewey had

ranches about seven or eight miles east of the lake, and the Big Piney road was about four miles eastward. The testimony as to the extent that people travelled over the Old Emigrant Trail or were found, from time to time, in the neighborhood of the lake is somewhat indefinite. Harry Branson testified that at least some people travelled over the trail from time to time, and would be found in and about Dry Lake and other lakes eastward during duck season, which in 1923 lasted from September 16th to December 16th. There is a lack of affirmative evidence, aside from what will be mentioned, as to the presence or absence of people in or near the camp of deceased from October 10 to 13, 1923.

The last time that deceased was seen was at noon, on October 10, 1923. Joe Arambide, the camp-mover, ate dinner with him at that time, and after that left to go to another camp in charge of Erramouspe, about five miles away. He returned on the afternoon of October 13, and found the sheep about two miles distant. He did not find the deceased, and the next morning went to get Bob Erramouspe. The two instituted a search, saw Mike Smith and asked him if he had seen the deceased. The defendant's answer, according to the testimony of Joe Arambide, was:

"I seen him. Mike Smith told us that he seen that fellow going west and walking fast. That was the day before yesterday, he told us, and he says he seen him and he had something upon his shoulder, going west and walking fast."

As related by Erramouspe, defendant's answer was:

"Well, I saw a fellow going up west of my camp the day of the 12th in the evening, about sundown, and he had something on his shoulder, something that looks like a rifle or something." These men thereupon attempted to discover human footsteps, but found none. A further search was made in the next succeeding days by a number of men, but no trace was found of human footsteps, of the man

mentioned by Smith or of the deceased. Whether or not human footsteps might have been reasonably discovered in that country, and at that time, does not appear.

The remainder of the testimony may be related in connection with the actions and movements of defendant. It seems that Joe Arambide talked with defendant when coming from the mountains, in and about some lakes, east of Big Sandy. That was probably in September, 1923. Arambide was hunting ducks around the lakes, with the sheep of defendant near, and Smith, evidently afraid that some of his sheep would be hit, "hollered" at Arambide, and according to the latter's testimony, "he told me if I didn't cut that out he was going to throw me in the water." It does not appear from the state's testimony that defendant knew the deceased at that time, and if the defendant's testimony is true, he never knew him. Defendant, as already stated, moved over near "dry lake" early in October, probably not later than October 5, 1923. On October 7 or 8, Dewey, his employer, was with him. Defendant had not left the range since June. His shoes were worn, his clothing was light and scanty, and winter was coming on. Something in defendant's conduct indicated to his employer that he was getting restless and wanted to go to town "because he hadn't bought any clothes and he had quite a little roll coming, and I kind of thought he was getting dry." The prosecuting attorney, as indicated from the questions in the record, thought it unfair for defendant's former employer, though he was a witness for the state, to give this testimony, so damaging to the state's theory. But the testimony is corroborated by many of the subsequent acts of defendant. In any event, Dewey instructed Roberts, the camp-mover, that if defendant should quit, he himself should take charge of the sheep. That was about October 7 or 8. On October 9, 1923, Earl Pulley, together with Harry Branson and Mike Bolin, who were hunting for some of Pulley's horses,

were at defendant's camp and ate dinner there. The two former gave testimony to the effect that defendant came to the camp about half an hour after their arrival and told about having a "mix-up" with the sheep of deceased. Since the state relies upon this item of testimony as showing a motive or incentive for the killing of deceased, we shall set this testimony out in more detail later and shall not pause to do so now. In that connection Branson testified that "he (Smith) just remarked that there was a little job that he had to do—there was some clothes or something that he had to be buying or something like that"—indicating that, as Dewey also had stated, defendant was getting ready to go to "town." Roberts, the camp-mover, left October 10, to go to Dewey's ranch and did not return till October 13, leaving defendant alone in his camp during that time, just as the deceased was left alone in his camp during the same time. And it was during this period, according to the state's theory, that deceased was killed, and probably prior to the afternoon of October 12, for Pulley and Branson and Bolin, who were still hunting for horses, passed the camp of deceased on the afternoon of that day and saw the sheep some distance away—one-half mile to two miles—and without a herder. The state's theory is that from and after the time of the homicide, claimed to have been committed by defendant, the actions and movements of defendant indicated flight. His camp and his sheep were not moved either on October 12 or 13, but he and Roberts apparently commenced to move them on the morning of October 14 toward the Big Sandy, where, as testified by some witnesses for the state, though contradicted, the feed was not as good as near the dry lake. However, Arambide testified that a sheep camp is never kept in one place more than from three to seven days, and that sheep grazed off the feed for two miles around a camp. In the forenoon of October 14, 1923, defendant had his sheep south of Dry Lake, moving east, as

testified to by Erramouspe. The same witness saw defendant with his sheep about 10 o'clock of the forenoon of October 15, about a mile west of the Big Piney road, and he had, accordingly, moved the sheep three or four miles during a day. Some time during that day, defendant left his sheep in charge of Roberts and started for Rock Springs. He arrived at Farson between three and four o'clock of the afternoon of that day, and told Arnott, the storekeeper at that place, according to the latter's testimony, that he saw some of Dewey's lambs on the way and wanted to know from him where Dewey was. He was told that he probably was near the "26-Mile-Well," evidently 26 miles north of Rock Springs and south from Farson a considerable distance—probably 20 miles. Arnott offered to phone to that place, went in the store for that purpose, but when he came out to tell defendant that Dewey had not yet arrived there, he found defendant had just boarded an automobile going south, leaving his horse, with saddle and bridle on, in the corral near the store where sheepherders, apparently, were accustomed to leave their horses. Defendant claimed that one Bertagnolli had promised to take care of his horse. Defendant arrived at the so-called "26-mile-well," in charge of one Andrew Smale, close to five o'clock in the evening and inquired where Dewey was, who, it seems, was driving a band of sheep to Rock Springs for marketing purposes. He was informed that Dewey had not yet passed that place, and defendant, accordingly, wanted to get the first automobile which returned north. Smale testified that defendant seemed somewhat nervous, and kept going back and forwards to and from the road to find out if he could see an automobile going north; that he also at that time stated that he had seen some of Dewey's lambs on the road, which Dewey had evidently lost; that he told of having to get a pair of shoes at Rock Springs, and when he was asked why he did not get them at Farson, he said that

there were none there big enough for him; that upon being asked whether he had found out anything about the lost sheepherder, the deceased, and that there was talk that he "had been done away with," defendant answered that "he didn't think so; that he thought that he had just walked off and would show up later; that the son-of-a-bitch will show up. He just went crazy." Arnott testified that he did not stop at Farson to get shoes. Defendant soon, while talking to Smale, found an automobile going north, and went with it. He found Dewey apparently about two miles north from Smale's place, and stated to him, so Dewey testified, that there was nothing to the story he told about the lost lambs. He asked for "some" money, not for what was due him, but Dewey voluntarily paid him all, amounting to about $300. Defendant then found an automobile going south and arrived in Rock Springs that evening. At about nine o'clock of the same evening he went to the house of Martha Uzelac, whom he evidently had known previously. He was accompanied by three or four men and a gallon of whiskey, which they drank. They ate at that place about midnight and later departed, the defendant apparently staying at a hotel. The next morning he went to a bank and cashed the check which he had received from Dewey. Later, in the forenoon of the same day he, again accompanied by several men, went back to the house of Martha Uzelac. They got drunk and defendant went to sleep in one of the rooms of the house. Some time during the afternoon a deputy sheriff and a policeman went to this place and inquired for the defendant, and they were informed by Mrs. Uzelac that she had not seen him. She explains the statement by saying that she was afraid that the intoxicating liquor which defendant brought might get her into trouble. When Smith awoke, he was informed of the inquiry by the officers. He thereupon took a taxicab and went to Sweetwater, a village five miles distant, to a

place conducted by Louis, the Italian, whom he evidently had known previously. He stayed at that place till the next evening, drinking in the meantime, mainly, apparently, of wine at the place. A daughter of Louis testified that while defendant was there, he kept going into a room, whenever anybody would come, inquiring who it was, and that he shaved off his whiskers and mustache during that time. The testimony as to when he shaved is much in conflict. On the evening of October 17, 1923, the sheriff came to the place, found defendant with a glass of wine, on account of which he went into another room. He was then "clean-shaven," and was not recognized, but when he was asked his name, he told it. He was taken to jail, where he remained till October 26, 1923, when he was released. During this time, according to the witness Yates, he stated that his revolver, a razor and some other things had been taken from his camp near "dry-lake." The defendant's testimony was to the same effect. None of these things were ever found, so far as indicated by the testimony. Defendant at that time also told Yates that he had taken care of his horse at Farson, although in a conversation shortly previous to the trial herein, he stated that one Bertagnolli had promised to take care of it, and defendant testified to that effect.

This, then, is a general outline of the testimony, but some other pertinent facts will be mentioned hereafter. The state claims that it has shown a motive for the defendant to commit the crime, namely, the motive of robbery. This is partially based on the fact that it appears in the evidence that the deceased had forty dollars and a gold watch on his person, and that a rifle in the camp was gone, none of these things having been found later. It may be true, of course, that robbery was the motive of the crime. But there is no testimony that defendant subsequently had either of these articles or any part thereof in his possession, and taking the testimony as a whole,

the contrary would seem to be indicated, and while the watch and the rifle might have been thrown away, the likelihood of that in the case of money was not so great. No blood-stains or any guilty marks were found on defendant, and if the evidence and absence of evidence on this point has any tendency to show anything, it would seem to point to the defendant's innocence rather than his guilt.

The state further claims that the ill-feeling of defendant toward deceased furnished a sufficient motive or incentive. The evidence on that point was by Pulley and Branson. As to the defendant's statement of October 9, at the latter's camp, Pully testified:

"We was sitting in the wagon eating lunch with the camp mover that he had fixed for us, and he (the defendant) was telling the camp mover about being down to the lake, and that man, this herder (the deceased) come over there and that him and this other herder come very near mixing their sheep, and he asked this herder, if he didn't have anything else to do but shoot ducks." "Q. Did he use any swear language—any cuss words? A. He said he didn't have—now let's see—no, not that I remember. Q. You don't remember whether he used any swear language? A. No, sir."

Branson testified as follows:

"Q. What did Mike say? A. Well, something—I couldn't recall the words exactly. I don't believe—but it was something about mixing, or awful near mixing with the sheep. Q. Was there anything said by Mike about Urrutia hunting ducks? A. I believe he said he had better herd sheep, or asked him if he had quit herding sheep, and was hunting ducks, or something like that."

On cross-examination he said in part:

"Q. Just how did he (Smith) express that now? What did Roberts say in the conversation between the two men? A. Roberts didn't have nothing to say. He just made the

talk with this other fellow there, something about mixing. He said he guessed he had quit herding sheep and gone to hunting ducks and turned his sheep loose. * * * Q. But why are you so sure of this particular conversation and you can't remember any of the other or any part that led up to it or ended it? A. There wasn't really anything said *. * *. Q. Now this conversation that Smith had with his camp mover was nothing more than an ordinary conversation, was it? A. Just ordinary, like a fellow would come into his camp. Q. Just a conversation in an ordinary tone? He was just talking to his camp mover? A. Yes. Q. Just wondering whether this fellow was hunting ducks or whether he was herding his sheep? A. Yes, sir.''

Aside, perhaps, from the fact that the conversation sounds somewhat as though it might have related to the incident told by Joe Arambide when he was hunting ducks, in September, we are unable to see how this testimony shows any ill-feeling on the part of the defendant toward the deceased, even on the 9th of October, 1923, let alone furnishing a motive or incentive for any murder. The mixing evidently referred to the sheep. If defendant ever had been angered by what took place, it evidently would have been at the time mentioned. But he seemed to show no feeling about it one way or the other even at that time. Nor do we think, in view of the fact that the defendant was a sheepherder, that the language used by the defendant about the deceased to Smale showed any ill feeling; particularly is that true when we consider the statement as a whole.

Nor do we think that there was any substantial testimony to show flight on the part of the defendant. True, he seemed to be in haste when he left his horse in the corral at Farson, without taking off the saddle or bridle. That is partially explained by Smith when he says that Bertagnolli promised to take care of the horse. However that may be, it is clear that the hour was getting late; defendant wanted to get to Rock Springs. He evidently

had a sudden chance to ride, which he wanted to do, and it is not unlikely that he thought best to take the first opportunity that was offered him, since he might not have another for some time. True, he might have gotten shoes, if that is what he wanted, at Farson, or at another place four miles further south, but if by nothing else, it is explained by the fact that defendant had bought a slicker from or through the Farson store some months before; the slicker did not wear well, and he kept complaining all summer about that and about the high price which had been charged him therefor. It is no wonder that he would not, under the circumstances, buy his shoes there. He lied to Smale, so the testimony indicates, about having gone into the Farson store, and that he did not find any that were big enough. He probably did not care to complain to Smale about this store. In any event, the incident is insignificant, could not help or hurt him in any flight and can have no bearing in the case. Then, too, he lied about the lost lambs of Dewey. That is explained by Dewey by saying that the defendant thought that by telling this he would be more likely to find out where he, Dewey, was. And there is, perhaps, another explanation, aside from that. He knew Dewey was going away, to market, and would be gone for some time. He tried to find him. If he could get word to Dewey before leaving Rock Springs, that some of his lambs were lost, the latter, so defendant doubtless thought, would be apt to try to locate defendant, when otherwise, he might have left without seeing the defendant. Smale testified, that defendant seemed somewhat nervous and kept going to the road to see if an automobile were going north. That is, probably, not to be wondered at. It was five o'clock; night was coming on, or had already come; he was 26 miles from Rock Springs, and he had not yet seen Dewey. His nervousness apparently disappeared when he at last found Dewey.

In any event, whatever these little incidents may have meant, their significance vanishes completely when we bear the main facts in mind. Dewey concluded, on October 7 or 8, that defendant wanted to go to Rock Springs. On October 9, Branson heard him say that he wanted to buy some clothing, and this testimony corroborates Dewey. The murder, if it occurred, occurred not later than October 12th. Yet the defendant remained where he was on that day and the next one. He did not commence to leave till October 14, and then he moved his sheep leisurely, and not fast, as the state attempted to show. When defendant saw Dewey, he asked for only a part of the wages that were due, and not for all, as one trying to flee from the scenes of his crime in all likelihood would have done. And the unanswerable question that overshadows all is, why should the defendant, if he had a guilty conscience, go to Rock Springs, the main town in Sweetwater County, where he was best known, and remain there until his arrest? And we are unable to see that the defendant attempted to conceal himself there, because of the commission of any crime of murder. Twice, he went to the house of Martha Uzelac in company of a number of men, which shows the reverse of any desire of concealment, and he cashed a check at a bank. It is possible that he left Mrs. Uzelac's house, because he wanted to avoid the officers who had called there, but the circumstances make it as reasonable and probably much more reasonable to say that he did so at that time, rather because of his intoxicated condition and the possession of liquor, than because of the crime of murder. And he went to the house of a friend or acquaintance but five miles away, where he could be furnished with more liquor, and when the officers found him he readily told his name. The great mass of testimony introduced to show that he was shaved while in Rock Springs and where he was shaved, and whether he had a long or a short-pointed

mustache and a long or a short beard, previous to that time, seems all to be beyond the point, for the evidence is clear that he ordinarily had no beard and no mustache, and had none when Dewey hired him. Further, the officers evidently had no trouble locating him at Mrs. Uzelac's and later at Sweetwater.

The state claims that the defendant lied when he stated that he saw some one going west on October 12, and base that on the fact that Erramouspe and Arambide could not find any tracks of a man. But there is no testimony in the record that a man's tracks could be seen or traced on the prairie. Nor does it appear that the defendant had a much greater opportunity to commit the crime than several others, who were not so far away. A few miles in distance would not, in a prairie-country, make a great deal of difference, and ought not to be sufficient to convict the defendant of the crime with which he stands charged.

We think that the facts and circumstances in evidence in this case are just as explainable on the theory of innocence as that of guilt, and in fact many of them point to innocence rather than guilt. We think the evidence wholly insufficient to convict the defendant. There are some circumstances shown in the record which, when considered by themselves, are suspicious, but it is doubtful that even this is true when considered in the light of all the evidence. In any event a man cannot be convicted upon mere suspicion, or even upon probabilities. Gardner v. State, 27 Wyo. 316, 196 Pac. 750, 15 A. L. R. 1040. As illustrating the point, see the case of State v. Sieff, 54 Mont. 165, 168 Pac. 525, where the defendant had made many statements which strongly tended to cast suspicion upon him of having committed the crime of arson with which he was charged. The case is very much stronger in its facts than the present one, but the Supreme Court reversed a judgment of conviction.

The judgment herein is reversed and the cause remanded for a new trial.

*Reversed and Remanded.*

KIMBALL and RINER, JJ., concur.