HARTMAN *v.* STATE.

(*Knoxville,* September Term, 1947.)

Opinion filed November 29, 1947.

SUSONG, PARVIN, FRAKER & ROGAN, of Greeneville, for plaintiff in error.

*WALTER R. GRAY, Dist. Atty. Gen. and LEON E. EASTERLY, both of Greeneville, for the State.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

Not later than just before day light on Sunday morning, October 20, 1946, the dead body of Mrs. Edith Hartman

---

*The Attorney General and Reporter was of the opinion that the conviction in the present case could not be sustained under the record and thereupon the District Attorney General and Special Counsel were requested to brief and argue the case.

was found by her husband, plaintiff in error, Luke Hartman, hereinafter referred to as defendant. The body was found in their home in a room to the left of and across the hall from the room in which she had retired on Saturday night. There was much evidence of carbolic acid in both the bed room and the room in which her body was found. The husband, Luke Hartman, was subsequently indicted for murder in the first degree, the indictment charging that he so murdered his wife by administering to her ''a large quantity of deadly poison called carbolic acid.'' He denies that he had anything whatever to do with the death of his wife. He was, however, convicted of murder in the first degree with punishment fixed at twenty-one years in the penitentiary. By appropriate assignments of error he insists not only that the evidence preponderates in favor of his innocence, but also that there is no evidence to support the verdict, and including the insistence that there is no evidence of the *corpus delicti.*

The domestic life of Mr. and Mrs. Hartman had been most unhappy despite the fact that they had four children, the oldest being ten years of age at the time of the trial of this case. This unhappiness was due in large part at least to the apparent philandering and infidelity of defendant, Luke Hartman; the woman in the case is alleged to have been one Hilda Foulks.

Mrs. Hartman obtained a divorce in April of 1946. The couple again married in August of 1946 prior to her death on October 20 of that year. Although the Trial Judge excluded as incompetent much evidence as to threats of Mrs. Hartman to commit suicide, because these threats were made prior to the aforementioned divorce, there is, nevertheless, admitted evidence in this record that the deceased after the second marriage did at least discuss suicide. Approximately two weeks prior to her death she

352

intercepted what may well be called a love letter written by the woman Hilda to the defendant. She discussed the matter with neighbors and there is no question but that the deceased was in a most unhappy state of mind. Subsequent to her death and while the defendant was in jail, the sheriff intercepted another love letter written from Norfolk, Virginia, presumably by this woman to the defendant.

On the day immediately preceding the night of her death, Mrs. Hartman had carried the two little boys into town for the purpose of buying them some clothes. The defendant, a farmer, remained at home and at work in the field. The two little girls stayed with a nearby neighbor. Mrs. Hartman and the boys returned from town fairly late in the afternoon. The little girls saw her approach and all reached the home about the same time. Defendant was on the bed in the down stairs bed room which was accustomed to be occupied by the wife and the two little girls. The conduct of Mrs. Hartman on that day seemed to be entirely normal. However, upon occasions after the re-marriage of this couple Mrs. Hartman had remarked to neighbors or friends on one or more occasions that the defendant was carrying a bottle of carbolic acid in his pocket. He denies this and says that he did carry a bottle of medicine in his pocket but that it was for an unrevealed illness. There is evidence in this record that he was suffering from a venereal disease of some character.

The children have lived with their maternal grandfather since the untimely death of their mother. Litigation between this grand-father and their father resulted in the custody of these children being awarded to that grandfather. He, being the father of the deceased, is quite active in the prosecution of this defendant whom he apparently believes to have murdered his only child.

The little girl and the little boy ten and nine years of age, respectively, at the time of the trial testified that when they entered the home on Saturday afternoon upon the arrival of their mother from town the odor of carbolic acid permeated the entire house consisting of four rooms and the mother after the defendant left the house made an unsuccessful search every where for this poison. On account, no doubt, of the ill treatment of this defendant towards his wife and the mysterious circumstances surrounding the tragic death of this young woman, this defendant seems to have been at once suspected by the neighbors and officers of having murdered his wife. On Sunday morning the officers talked with the little girl who subsequently testified as to the carbolic acid smell on Saturday afternoon. In the conversations which she had with the officers that day she at no time mentioned the fact that the odor of carbolic acid permeated the house on the afternoon before. She says that she was subsequently reminded of this by those with whom she lived. The defendant denies that he had any carbolic acid or that there was any odor thereof in the house on that Saturday afternoon. It is a fact of which we cannot escape notice that if this defendant was in the possession of carbolic acid upon that Saturday afternoon and had it for the felonious purpose of taking the life of his wife he conducted himself in a most unusual fashion in so carelessly removing the stopper from the bottle and/or spilling it over the house with the certain knowledge that its unmistakable odor would be detected. Aside from motive to be hereinafter discussed, this alleged carbolic acid odor in the home on the Saturday afternoon in question is perhaps the first link in the chain of circumstances upon which the State relies to sustain the conviction in this case.

A neighbor passed the home between 10:30 and 11 o'clock on that Saturday night and observed a light in the down stairs right-hand bed room where the mother and two daughters slept that night. It is said that this light at that hour was unusual. The testimony of the little girl is that the defendant went to bed early that night in an up-stairs bed room immediately above that in which the mother and two little girls slept and later the two little boys went to bed in that up-stairs room. The little girl says that she was the last to retire because she had been occupied with her toys, etc., and that she got in bed without turning out the light and then turned it out upon directions from her mother. The time this little girl went to bed is not shown. The room to which the neighbor referred was the one in which the little girl says she turned out the light after she went to bed.

During the night the defendant and his little nine year old boy found it necessary to get up and go into the yard. In getting to and from their bed room, it was necessary to pass through the bed room occupied by the mother and the little girls. As the father and son passed through this room on their return from the yard the father stopped to pull the cover over the two little girls. The little boy testifies that his mother was not in the room at the time. The father arose shortly before day light. He says he went into the down stairs bed room and as he was there putting on his shoes he noticed the absence of his wife but thought nothing particular of it as she was sometimes in the habit of sleeping on a davenette in the room across the hall in which her body was found, and that he went to the door of this room for the purpose of getting her up, and discovered her dead body on the floor. The little boy testifies that he went down stairs with his father when they got up and that they went to the back porch and there the

father peered through the window into the room where the body of the mother was and said to the little boy "your mother is dead." This testimony was in response to the following suggestive question "When did your father look in there and see your mother's body?" The little fellow had never to that point testified that his father had looked in the room where his mother's body was, but immediately preceding this suggestive question had testified on direct examination as follows:

"Q. Did he go to the window over there for any purpose. To the other room where your mother's body was found? A. I don't know.

"Q. Did he, or not, flash the flashlight in the window? To look in there to see what he could see? A. I don't know.

"Q. What did he say to you on the porch about your mother? A. I don't remember.

"Q. What did he say about your mother? A. I don't remember.

"Q. Did your father say anything to you about seeing something white there in that front room and to get the flashlight so that he could see what it was? A. I don't remember.

"Q. Do you remember your father flashing the light in that room there? A. No."

Before the light of day had come the defendant went for assistance to the home of a neighbor by the name of Malone. Malone and his wife testify, no doubt correctly, that the defendant said to them that he had found his wife "dead in bed." We are unable to attach any significance to this statement erroneous as to where the body of the wife was. The defendant knew she was on the floor. He was seeking the assistance of Malone and necessarily knew that Malone would see her body on the

floor when he arrived. We are unable to conclude any design for deception in the making of this remark.

The body of his wife when found was clothed only in a thin gown. She was lying on her stomach one arm outstretched and the other at some point and to some extent supporting her chin on the left. The gown was pulled down in front, but twisted and up to her shoulders in the back. The body was allowed to remain in that position and at that point for a considerable length of time, and possibly until the arrival of the coroner's jury. It is the insistence of the State that the fact that her husband permitted the body of his wife to so lay there exposed to the public gaze is a circumstance pointing to his guilt. Malone testifies that when he arrived in the early morning the defendant suggested that the body should be moved and he, Malone, advised against this. It is not unreasonable to conclude that the defendant thought best to let the body alone pending further developments following the suggestion of Mr. Malone. It is to be observed that other neighbors were there. In response to the ordinary dictates of humanity it is reasonable to conclude that any one or more of these neighbors would have felt entirely at liberty to cover the body without consulting the defendant except for the fact that they too thought that matters should be left as they were found pending investigation.

It is testified that the defendant did not display any emotion that morning, and this is pointed to as another circumstance evidencing guilt. It might be concluded with even more logic that if he had poisoned his wife he would have been careful to publicly display great emotion to the end that suspicion might be diverted.

When Malone arrived, the defendant played his flashlight over the room in which the body lay and pointed

out a spot behind the davanette where apparently the wife had vomited and pointed out a bottle which had contained carbolic acid close to her body or in the room. This activity of the husband in looking around in the room in which the dead body of his wife had just been found is pointed to as another circumstance which evidenced guilt.

Had he not displayed such interest under the situation existing could that not be argued with equal force as a circumstance pointing to his guilt?

In the room in which the body was found was a bottle which had contained carbolic acid. Carbolic acid was on the front of her gown. A glass with carbolic acid in it or the odor therefrom was found in the down-stairs bed room hereinbefore referred to. At three or more places in that bed room ashes were found spread over points on the floor where carbolic acid had been poured or spilled. This is pointed to as another circumstance showing guilt. As to this, the conclusion is inescapable that if the husband administered carbolic acid to his wife that night he was most careful to leave behind evidence of the use of that poison. This, we think, is most unusual. On Sunday morning the officers were interrupted by this defendant on two or three occasions while they were talking to his little boy who was nine years of age at the time of the trial some months later, and the officers were forced to instruct the defendant to go away and let them talk in private to the little boy. It is insisted that this is a link in the chain of circumstances evidencing guilt. It may do so, but it may also be said that this man knew at that time that he was under suspicion and in response to the natural law of self-preservation, it is not unnatural, though quite indiscreet, that he should have attempted to become a party to the con-

ference which the officers were having with this child about him, the defendant.

It is finally insisted that the defendant had a motive to commit this atrocious crime, to-wit, (1) because of his association with this Hilda Foulks; and (2) to get property from his wife, it being testified that the defendant said he would "get it one way or another." It is suggested in briefs that the letters of this Hilda Foulks implied that she might be pregnant. People would certainly disagree as to whether these letters are susceptible to such conclusion, and in the light of the association between these two people as that association may be inferred from this record, such a condition of this woman, apparently much more than twenty-one years of age, would not be a motive for the commission of murder of his wife. In so far as it is the theory of the State that the motive was to permit unhindered association with this woman, it must necessarily be observed that he had unhindered association when divorced from his wife, but elected to again marry Mrs. Hartman.

With reference to the motive of the defendant being to obtain the property of his wife, there is no evidence in this record that she had any property except that upon one occasion defendant had removed some plows from a tractor and sold them, and the deceased said that the next time he did this she would replevy the property and to this he replied he would have it one way or another.

The deceased was a woman thirty years of age. She weighed not less than 125 nor more than 150 pounds. Probably the best evidence is that she weighed about 130 pounds. When found the next morning there were no bruises upon her body other than (1) a roughness of the skin on one leg, and this had been done four or five days prior to her death; (2) a slight discoloration on the

left side of her face where that face in death had rested on her hand or arm and which, according to the evidence in this case, must have occurred by reason of the contact of these two parts of her body at the time of and, of course, following her death; (3) a burn on her chin caused by carbolic acid. Her gown was not torn. There is no evidence of any bruises or scratches upon the body or face of defendant. None of the children were awakened during the night by any struggle between deceased and defendant, nor is there any evidence of screams or other noises occurring during the night. It is difficult to reconcile these facts with the insistence that carbolic acid was forcibly given to this young woman.

We have made this review of the evidence, all circumstantial, with statements as to the insistences which might legitimately be made by the State or the defendant, for the purpose of determining whether this circumstantial evidence establishes the *corpus delicti*. We have made this review because "it is well settled that 'all of the elements constituting the *corpus delicti* may be proven by circumstantial evidence.' " *Thompson et al. v. State*, 171 Tenn. 156, 160, 101 S. W. (2d) 467, 468. Unquestionably, this evidence fails to establish the *corpus delicti*.

A thorough autopsy was made not later than early Sunday night after the death of Mrs. Hartman sometime during Saturday night. It was made by Dr. Hale whose testimony reflects quite favorably his integrity, qualifications and lack of bias, and it is here appropriate to observe that this autopsy was made at the instance of the father of the deceased. We, therefore, examine his testimony and that of the other doctors who testified in the case for the purpose of determining whether by this evidence the *corpus delicti* is established.

Mrs. Hartman's body had been embalmed sometime Sunday morning at the direction of the defendant. During the course of the testimony of Dr. Hale upon the trial the following important questions and answers were had:

"Q. Carbolic acid will burn wherever it touches, won't it? A. That's right.

"Q. Now if it burns the inside, is that removed by the embalming fluid? A. It is not.

"Q. If a sufficient quantity was taken into the stomach to cause death, there would be certain burns there on the walls of the stomach that would be evident and conclusive, and would not be taken away by the embalming fluid, isn't that right? A. You would expect to find it so.

"Q. Doctor, don't you believe that if she had had sufficient carbolic acid in her stomach to have caused her death, that an examination within that time and a pathologist's examination would have revealed it? A. It would be expected, yes. But, as I say, carbolic acid can cause death very rapidly sometime, depending upon the individual's reactions.

"Q. But the normal thing would be for that to appear, wouldn't it? A. You would expect to find local changes due to the corrosive action of the drug, yes.

"Q. Doctor, did you, or not, find any condition in the body of this woman, anything which would cause her death, other than what has been mentioned? A. In my examination I found nothing on which I could base the cause of her death."

Dr. Cowles, the county physician, testified as follows:

"Q. If there was a sufficient amount administered at one time, or in a short period of time, to cause death, that would burn inside even more than it would on the skin outside, wouldn't it? A. I should think so.

"Q. State, whether, or not, in your opinion, the presence of carbolic acid in sufficient quantities to cause death could be definitely determined by an autopsy? A. I think so, yes.

"Q. The embalming fluid would not remove the scars would it? A. No sir.

"Q. And those scars would be apparent inside, as well as outside wouldn't they? A. I should think so.

"The contact of carbolic acid with either skin or tissue results in a corrosion, just like a blister, doesn't it? A. Yes sir.

"Q. And nothing would erase that except to remove the tissue itself, would it? A. That's right.

Dr. Dyer testified as follows:

"Q. Doctor, what is the effect upon the subject when a person takes carbolic acid? A. Well, carbolic acid is, what we call an escurotic or cautery as soon as it comes in contact with tissue, it burns a path right from the mucous membranes of the mouth down the esophagus, all the way, and when it gets into the stomach it burns the mucous of the lining of the stomach, turns it white, and it is lasting.

"Q. If there is alcohol in the embalming fluid, would that not tend to combine with the acid, the carbolic acid, that might be present, that is, there would be a blending of those liquids, would there not? A. If they could get in contact in the system, but not locally.

"Q. But I'm referring to any that happened to be in the system. A. If there's alcohol in the embalming fluid, it wouldn't have time, even if it were given at the time of the carbolic acid, to neutralize it.

"Q. I'd like for you to state whether, or not, in your opinion, if a person should take, or have administered to them, enough carbolic acid to cause death, whether, or

not, that carbolic acid would appear in the internal organs? On the internal organs? A. Yes, it would.

"Q. In other words, if the autopsy had been performed within 24 hours after death, in your opinion, would that appear on the organs? The corrosion or scarring of the tissues? A. I think you would find some evidence."

The conclusion from this evidence necessarily is that Mrs. Hartman was not administered carbolic acid. This leaves undetermined the cause of her death or whether she was murdered, or committed suicide or died from natural causes. It results that the *corpus delicti* has not been established. In the case of *Foster* v. *State,* 180 Tenn. 164, 174, 172 S. W. (2d) 1003, 1007, this court held, and in accordance with all its previous holdings, as follows: "No inference can be made from circumstances until the *corpus delicti* has been proven beyond a reasonable doubt. . . . 'In a homicide case, where the life or liberty of a citizen is at stake, and where the guilt of the accused must be established beyond a reasonable doubt, the causal connection between the death of the decedent and the unlawful acts of the respondent cannot be supported on mere conjecture and speculation.' . . . In fact, there is no evidence, that Wilson was murdered. Though that explanation of the facts is probable, 'the crime, as well as the criminal, must be shown.' . . . In order to convict of crime it is necessary that the proof show both the *corpus delicti* and the criminal agency of the accused."

Reversed and remanded.

All concur.