[Crim. No. 11998. In Bank. June 26, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIE
CURTIS MILLER, Defendant and Appellant.

462

Lloyd H. Riley, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and John Fourt, Deputy Attorneys General, for Plaintiff and Respondent.

McCOMB, J.—A jury found defendant guilty of first degree murder and fixed the penalty at death. This appeal is automatic (Pen. Code, § 1239, subd. (b)).

*Facts*: About 9:30 Saturday morning, August 12, 1967, defendant, 40 years of age, called at the home of Mrs. Betty Abron. He was drinking a can of "Colt 45" stout malt and carried a paper sack containing two additional unopened cans of "Colt 45" stout malt. About 30 minutes after his arrival, he told Mrs. Abron that he would go to the grocery store to

get some soda pop for her five children. Jeannine Abron, aged 8, received her mother's consent to accompany defendant to the store. In response to Mrs. Abron's inquiry, defendant said he would bring Jeannine right back. Jeannine collected some empty pop bottles, climbed into the front passenger seat of defendant's 1954 Ford station wagon, and rode away with him about 10 a.m. This was the last time Mrs. Abron saw Jeannine alive. She was wearing a red turtleneck sweater, white underpants without rips or holes, and blue bermuda shorts, slightly split along the outside seams at the hemline. Her nude, partially decomposed body was found about 7 a.m. the following Wednesday, face down in the shallow water of Dry Creek, at a point adjacent to the intersection of Elkhorn Boulevard and 10th Street in Sacramento, approximately four miles from her home. The head was under the water, and the heels nearly touching the bank of the creek. The body was in a semi-kneeling position, with the legs drawn up. The back and buttocks were out of the water. The arms were in the water, elbows bent. Two branches approximately 13 feet long with considerable foliage and leafy material had been chopped down and placed in a tree above the body, tending to obscure it from observation by light planes taking off and landing on an adjacent north-south airfield runway.

Jeannine's red sweater was hanging in the branches of a tree approximately 15 feet south of the body. Also hanging on a branch below the sweater were her blue bermuda shorts, completely torn across the crotch and along the sides of the legs. Submerged in the water under the shorts were her panties, torn at the crotch. On the bank of Dry Creek above the body there was a matted area of grass, oval in shape, about 6 x 10 feet in area. Within the trampled grass area an unsmoked Capital's Palma cigar in cellophane wrapping and a "Ballerina" brand ballpoint pen were found. An empty "Colt 45" unrusted one-pint can was found in the nearby grass.

Before the body was recovered defendant was arrested on suspicion of murder, and, pursuant to a search warrant, his station wagon was towed to the Sacramento County morgue and searched. Two Capital's Palma brand cigars in cellophane wrappings were on the front seat. Defendant had previously purchased Capital's Palma cigars and had four or five of them in his station wagon on Saturday, August 12, 1967. The police also seized a shirt belonging to defendant, which shirt defendant identified as one he had worn on Saturday morning. The shirt pocket was stained with ink. A

chemical examination of the ink stain and the ink in the ball-point pen found near Jeannine's body showed that both inks were of the same type.

An autopsy was performed by a physician and surgeon specializing in pathology on Wednesday afternoon, August 16, about 54 hours after Jeannine was last seen alive. The body was in a bad state of decomposition. In the physician's opinion, the swelling of the body, the discoloration of the skin, and the distortion of the features were due to degenerative processes occurring after death. The left vulva (an area on the left side of the genitalia, outside the body of a female) was more swollen than the right vulva and was discolored differently from the surrounding tissues. These conditions led the pathologist to believe that injury or abrasion had occurred to the left vulva. Because of the decomposition, he was unable to reach a definite medical opinion as to the cause of death, which he estimated to have occurred on the previous Saturday or Sunday.

Mrs. Lillian Hayer, who resided on "G" Street in a southeasterly direction across the Rio Linda High School athletic field from the place where Jeannine's body was found, testified that sometime between 11:30 and 11:45 a.m. on Saturday she observed that an old two-toned station wagon had been driven into the shrubbery along the bank of Dry Creek. The station wagon was identified by Mrs. Hayer as "the same one" as the station wagon pictured in photographic exhibits of defendant's car. She marked the place the station wagon had been parked on an enlarged aerial photograph of the scene. This same place was identified by two prosecution witnesses as the spot where they discovered Jeannine's body. Mrs. Hayer's son also observed a light colored 1954 or 1955 Ford station wagon parked at that point on Dry Creek at approximately noon on Saturday. Mrs. Hayer observed the station wagon leaving the area some time prior to 1:10 p.m. Saturday, driven by a "dark-complected" man.

Mr. Royden E. Hayer (Lillian Hayer's husband) who operated an airport adjacent to the Hayer residence on "G" Street, was working in a building at the airport when he heard a shrill cry, like a child's frightened scream, about 11:15 a.m. on Saturday. He went outside to see if he could locate the source of the scream. He looked around but was unable to see anyone and returned to his work.

At noon on Saturday, Jerry Leikauf was working on a friend's car parked on 10th Street easterly across the Rio

Linda High School athletic field from the point in Dry Creek where the body of the victim was discovered. He observed a Ford station wagon of the same make and model as defendant's parked near Dry Creek across the athletic field. Between 12:30 and 1 o'clock Saturday afternoon, he saw the station wagon leave the area, driven by a Negro with dark complexion.

Shortly after 11:15 Saturday night, Jeannine's mother located defendant asleep in his station wagon parked in front of his apartment about four or five blocks from the Abron residence. She asked defendant if he knew where Jeannine was and he answered, "I left her standing on your front porch." Mrs. Abron replied, "No, you didn't." Defendant said, "When I left your house, she was standing on your front porch." Mrs. Abron told him that her neighbors had seen defendant leave the Abron residence with Jeannine, to which he replied, "Well, I'm going to talk to them," and drove off.

About 2:10 Sunday morning, Sacramento police officers met Mrs. Abron in front of defendant's apartment and asked defendant if he knew where Jeannine was. He answered that he didn't know where she was and said she hadn't left with him in his car. He said that the last time he had seen her she had been standing on the Abron porch. He denied that he had been at the Abron residence on Saturday morning, said he had visited another house on the same street and had seen Jeannine playing with other children around his station wagon, but she had not been in his car that morning. In the presence of the officers, Mrs. Abron began arguing with defendant, who said he was sorry that anything had happened to the little girl, but that he hadn't seen her.

At the trial, defendant told a different story. He testified that on the Saturday morning in question he had driven Jeannine in his 1954 Ford station wagon from the Abron house to the Safeway market parking lot about four or five blocks from the Abron residence. Jeannine was last seen by defendant, according to his testimony, as she walked toward the front entrance to the Safeway store. He stated that Jeannine was left at the parking lot because it never occurred to him that she didn't know her way back home. He denied having any conversation with Mrs. Abron about his going to the store to buy soda pop for the Abron children. His testimony was that he agreed to drop Jeannine off at the store; that nothing was said to him about bringing her home; and that he did not agree to do so.

Defendant identified a number of the People's exhibits as photographs of the 1954 Ford station wagon, California license DQK 765, owned by him in August 1967. The station wagon is painted in two colors. The area above the rain gutter, and below the mid-body chrome strip, is painted a blue-green color; the area above the mid-body chrome strip and below the rain gutter is painted white.

Prior to moving to Sacramento in May 1967, defendant had lived in Bakersfield after his release from prison, and at the penalty trial the prosecution introduced evidence of an offense committed there. Felicia Nunley, 13 years of age, testified that on Sunday morning, April 2, 1967, when she was home with her brother and sisters while her mother was at work, she saw defendant, known to her as Willie Curtis, talking with her grandmother, who lived across the street. After her grandmother drove away in her car, defendant started walking away from the house until her grandmother's car turned the corner. He then came back to the Nunley residence and told Felicia he had left a pocket novel there. She said she didn't know where it was and offered to telephone her mother for the information. Defendant answered, "No, that's all right, I'll call her." He then asked permission to use the bathroom. In the meantime Felicia prepared her breakfast and took it into her mother's bedroom to watch television. Defendant entered the bedroom and asked Felicia if she was afraid of him. He put his arm around her neck, and she started to scream. Defendant displayed a razor blade that he had taken from the bathroom, put his hand over her mouth, and said he would cut her throat unless she became quiet. He attempted to caress her genital area, but Felicia knocked his hand away. Defendant tried to kiss her, saying, "All I wanted was a little kiss." Felicia's older sister, Dina, who had been asleep in another bedroom, came in and asked defendant what he was doing. He answered, "Aw, Dina baby." Dina asked defendant to leave, and he did so. Felicia telephoned her mother, who immediately left work after asking one of her co-workers to send the police to her home. Later, defendant telephoned Mrs. Nunley to say he was sorry.

Evidence of another prior offense committed by defendant was also introduced at the penalty trial. Mrs. Esther Cooper, formerly Esther Grissett before her marriage, testified that in September 1956 she lived in one unit of a duplex on East Newton Street in Los Angeles. She was then 11 years old and was babysitting with infant children of Mrs. Stewart, whose

front door was opposite that of the Grissetts. Defendant knocked on the door of the Stewart unit and asked if anyone was home. Esther opened the door and said, "Mrs. Stewart isn't here." He forced his way in, walked through the living room and into the kitchen. Esther and the 3-year-old Stewart child followed defendant, and as Esther entered the kitchen defendant placed his arm around her throat. She started screaming and kicking, and defendant told her, "If you don't be quiet, I'll kill you." Defendant placed his hand over Esther's mouth and held a sharp implement to her throat. Esther's father, Henry Grissett, called to Esther from his unit after he observed the Stewart baby crawl out the front door. Receiving no response, Mr. Grissett ran into the Stewart kitchen, where defendant loosened his hold on Esther and ran out the back door. Mr. Grissett followed defendant and later assisted the police in placing him in custody. Four stitches were required to close Esther's neck wound, which was inflicted by defendant with a beer can opener. She still carries the scar from the wound. Defendant was convicted and served a term in prison for this offense.

█ *Questions*: First. *Was defendant deprived of a trial by an impartial jury by the exclusion of veniremen who were opposed to capital punishment?*

*No.* Defendant contends that a sizeable percentage of the general population was effectively excluded from the jury chosen to try him, in contravention of the rules enunciated in *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

*Witherspoon* held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (391 U.S. 522 [20 L.Ed.2d at pp. 784-785].) *Witherspoon* further states that "nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." (*Id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

At the time of trial, Penal Code section 1074 provided that "[a] challenge for implied bias may be taken for all or any of the following causes, and for no other: . . . (8) If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror."

Employing the language of the code, the court in examining the veniremen asked: "Do you have any conscientious scruples against the imposition of the death penalty that might preclude you from returning a verdict of guilty in a proper case?" The prospective jurors were informed that whenever a defendant was charged with murder there was the possibility that the jury might also have to decide the penalty.

Of the 38 veniremen examined in the selection of the 12 jurors who tried defendant, 15 were excused by peremptory challenges, 10 by the defense, 5 by the prosecution; 3 were excused by stipulation of counsel because of preconceived opinions about the case; 2 were challenged by defendant and excused for cause because of opinions about defendant's guilt; 1 was excused by the court, with consent of counsel, because of an opinion about defendant's guilt; 1 was excused by the court because of his knowledge of facts of the case; 1 was excused by stipulation because of personal hardship; 3 were excused because their conscientious scruples against the imposition of the death penalty would preclude them from returning a verdict of guilty.

The transcript of the *voir dire* examination of the three excused veniremen who expressed opposition to the death penalty reveals:

(Juror Okamoto) "Q. Do you have any conscientious scruples in relation to— A. No. Q.—the imposition of the death penalty— A. Yes, sir. Q. —which might preclude you from returning a verdict of guilty in a proper case? A. Yes, I am against capital punishment. Q. You are against it? Is that a conscientious opinion which you have? A. Yes. THE COURT: Well, then, under the law, you are not entitled to sit in this case. So, we will excuse you."

(Juror Falkenstein) "Q. What about the death penalty phase of this case, again keeping it in proper perspective? Do you have any such conscientious scruples that might preclude you from returning a verdict of guilt in a proper case? A. Yes, sir, I do not believe in capital punishment. Q. That is a conscientious opinion? A. Yes, sir. Q. And you do feel that

would preclude you from returning a verdict of guilty in a proper case? A. Yes, sir. THE COURT: Then you will be excused."

(Juror Simmons, Deputy Director for the State Department of Welfare.) "Q. Getting to the point of the death penalty phase of the case, any case, I am satisfied, of course, that you have discussed this and given it a lot of thought and study, perhaps, over the years. Do you have such conscientious scruples against the imposition of the death penalty which might preclude you from returning a verdict of guilty in a proper case? A. Yes, sir, I do. Q. I assume that is a deep-seated, long-standing opinion? A. Yes, sir, it is. Q. You understand that, under the law, you are not permitted to serve in a case wherein the death penalty is a possibility? A. Yes, I understand that. THE COURT: Thank you for coming in, sir."

It will be noted that these three veniremen were excluded for cause because they made unmistakably clear "that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (*Witherspoon* v. *Illinois, supra*, at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

In *People* v. *Fain*, 70 Cal.2d 588, 601 [75 Cal.Rptr. 633, 451 P.2d 65], the court noted the distinction between veniremen excluded for cause because they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, and those in the second category whose attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. We stated in *Fain* (p. 601): "One prospective juror emphatically stated that her views would preclude her from returning a first degree murder conviction, and she was properly excused for cause."[1] The second juror, examined at length

---

[1]The *voir dire* examination of venireman Whitlock, in significant part, reads as follows:

"Mrs. Whitlock, is there anything about the nature of this case that would preclude you from sitting as a fair and impartial member of this jury?

"MRS. WHITLOCK: Well, I don't believe in capital punishment and I'm sorry to take up the time, but I also stated at first when you, they first draw your name to be a juror and they send you the large piece of paper to type out, and I did so state on that paper.

"THE COURT: Since having so stated have you changed your mind?

"MRS. WHITLOCK: No, sir, I haven't.

"THE COURT: You may pursue the matter further if you wish.

"MR. WOLFE: In other words, then, Mrs. Whitlock, you say you are opposed to the death penalty, and do I then understand that as to Count

by the court and counsel, came within the first category, and we held that she did not make it unmistakably clear that she would never have voted for infliction of a capital penalty and was excused, therefore, in violation of the standards established in *Witherspoon.*

We conclude, therefore, that as with respect to the particular veniremen held properly excused in *Fain, supra,* the three prospective jurors excused in the case at hand likewise made it unmistakably clear that "their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."

 Second. *Was defendant deprived of a fair and impartial trial by the court's denial of his motions for change of venue?*

*No.* Defendant made a written motion for change of venue on October 4, 1967, which was denied without prejudice on October 11. Trial commenced on January 3, 1968, and after the jury was sworn, defendant made an oral motion for change of venue, which motion was also denied.

In support of his first motion for a change of venue, defense counsel filed an affidavit setting forth newspaper coverage of the search for Jeannine and the related arrest of defendant. Jeannine disappeared on August 12, 1967; defendant was arrested the following day; Jeannine's body was recovered on August 16. The newspaper articles attached to the affidavit were published from August 14 to September 23. The newspaper published on August 14 reported that "A tight veil of police secrecy was drawn over the case at the direction of [Sacramento County] District Attorney John M. Price. . . ." The paper published August 16 reported the discovery of Jeannine's body, saying: "The lid of secrecy which has been maintained in the case was tightened." Careful han-

---

1 of the indictment, the particular count that charges murder, do you then entertain such conscientious scruples or opinions that would preclude you from finding the defendant guilty of murder in the first degree?

"MRS. WHITLOCK: I don't believe in capital punishment at all. I think it's bad when someone goes out and kills someone else and is locked in a nice warm cell with turkey for Thanksgiving and Christmas, but I don't think killing them is the answer. I'm sorry. I just don't.

"MR. WOLFE: Your answer then, is what to my question?

"MRS. WHITLOCK: I don't believe in capital punishment.

"MR. WOLFE: That wasn't my question.

"MRS. WHITLOCK: Oh, I'm—

"MR. WOLFE: Would this preclude you, your feelings preclude you from finding the defendant guilty of murder in the first degree if the evidence would so warrant it?

"MRS. WHITLOCK: Yes."

dling of publicity by law enforcement officials was described in the press: "The detectives have refused to reveal what evidence, if any, was found in the [defendant's] car or elsewhere and have refused to let newsmen talk to Miller [defendant]."

The press gave fair coverage to defendant's denials of guilt. For example, the article dated August 15 stated that "Miller told his attorney, Lloyd Riley, he has done nothing wrong" and quoted Mr. Riley as saying: "He [defendant] told me he has confidence his position will prevail and that he had done nothing to anyone and has committed no crime. . . ." The article that announced the arraignment of defendant on the murder charge also quoted his attorney: "Mr. Miller emphatically denies any connection with, or knowledge of, the death of Jeannine. I have had several conversations with Mr. Miller. His approach has been one of complete candor. His attitude is wholly inconsistent with that of guilt. All that I have been able to discern so far in the way of facts and circumstances surrounding the disappearance of Jeannine would tend strongly to corroborate his statements to me.

"Mr. Miller extends to the mother a compassionate and understanding hand. He would stress to Mrs. Abron and the community the fact he has committed no crime and his conscience is clear.

"The death of Jeannine is in no way connected with Mr. Miller. There must now be an assessment of responsibility for the death of the little girl and when this is finally done I believe strongly Mr. Miller will be completely vindicated."

While the search for Jeannine was underway, the papers reported defendant's appearance in court on an earlier hit-and-run charge and his arrest on a warrant issued in Bakersfield charging him with contributing to the delinquency of a minor. After the grand jury indictment was returned, the press reported that a complaint charging defendant with kidnaping a boy and girl, aged 14, and assaulting the girl on July 18, had been filed against him. This complaint was subsequently dismissed by the district attorney.

When the trial commenced in January 1968, some five months after Jeannine's disappearance, there was no difficulty in selecting jurors who either were not aware of the earlier publicity or did not recall the details of the case from their reading about it in the press. Defendant challenged only two veniremen for cause. The challenges were sustained, and

both jurors were excused. After exercising 10 peremptory challenges, defendant was satisfied with the panel. He therefore cannot complain that any objectionable jurors remained where he still had ten unused peremptory challenges. (*People* v. *Wilkes,* 44 Cal.2d 679, 686 [6] [284 P.2d 481].)

Defendant orally renewed his motion for change of venue at the end of the second day of trial. The basis for the motion was that several veniremen had stated on *voir dire* that they held an opinion that defendant was guilty. Of the five veniremen who were excused because of preconceived opinions about defendant's guilt, two were challenged for cause by defendant and excused. The remaining three were excused by stipulation of counsel. Five additional veniremen admitted that they had previously either read newspaper accounts or otherwise heard about the disappearance of Jeannine but had no opinions regarding the guilt or innocence of defendant. Each was peremptorily challenged by defendant and excused. The record shows that those prospective jurors who were actually influenced by the pretrial publicity, as well as those who were exposed to such publicity but who denied that it had any effect on them, were excused from service on the jury.

In denying defendant's first motion for a change of venue based on pretrial publicity, the court ruled that the publicity related primarily to the victim's disappearance and search operations, noting that it "was handled with a great deal of care by the District Attorney and law enforcement people." In denying the renewed motion, based on prejudice of excused prospective jurors, the court concluded that "there is no possibility whatever . . . that you have a prejudicial jury or any person on the jury who has been prejudiced by the publicity which was had in this case." The court therefore, in the exercise of its discretion in denying the motions, applied the standard of reasonableness suggested by *Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], and proposed by the American Bar Association's Reardon Report, that a motion for change of venue should be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a "reasonable likelihood" that in the absence of such relief, a fair trial cannot be had. The determination may be based on "the court's evaluation of the nature, frequency, and timing" of the material involved. (See *Maine* v. *Superior Court,* 68 Cal.2d 375, 383 [6a-7] [66 Cal.Rptr. 724, 438 P.2d 372], applying the standard prospectively to cases that have not proceeded to trial on

April 17, 1968.) While the trial in the present case antedated the *Maine* decision, the court properly evaluated the nature, frequency and timing of the alleged prejudicial material and determined that there was no reasonable likelihood that defendant could not receive a fair and impartial trial.

*Third. Was the evidence sufficient to support the conviction of murder in the first degree?*

*Yes.* Defendant argues that since the People's case rests substantially on circumstantial evidence, the prosecution was obligated to present a case of circumstances which are "not only consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion," citing *People* v. *Hatchett*, 63 Cal.App. 2d 144 [146 P.2d 469].

The jury in the present case was properly instructed on circumstantial evidence.[2] Defendant's attempted application of the rule, that where the evidence is wholly or substantially circumstantial the court must give a cautionary instruction to the effect that such evidence must be irreconcilable with the theory of innocence, to the present case confuses the function of the jury with that of an appellate court. ■ After the jury, and the trial judge ruling on a motion for new trial, have found defendant guilty, the presumption of innocence in the trial court is replaced by the presumption in favor of the judgment. A reversal can be ordered only if upon no rational hypothesis is there substantial evidence to support the judgment. (*People* v. *Hillery*, 62 Cal.2d 692, 702-703 [2-5] [44 Cal.Rptr. 30, 401 P.2d 382]; see Witkin, Cal. Criminal Procedure (1963) § 683, pp. 666-667.)

■ There is no merit to defendant's contention that the evidence is insufficient to connect him with Jeannine's death. She was last seen alive in the right front seat of his Ford station wagon as he left the Abron residence about 10 a.m. Saturday morning, August 12, 1967. Jeannine's mother had consented to her accompanying defendant when he offered to buy soda pop at the grocery store for Jeannine and her four brothers. Defendant assured Mrs. Abron he would bring Jeannine back home.

[2]The instruction (CALJIC 26, rev.) reads in part: "Where the case of the People rests substantially or entirely on circumstantial evidence, you are not permitted to find the defendant guilty of the crime charged against him unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion and each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt has been proved beyond a reasonable doubt."

Defendant's station wagon was later seen parked in the shrubbery on the bank of Dry Creek between 11:30 a.m. and 1 p.m. on Saturday. Jeannine's nude body was found in the water of Dry Creek four days later adjacent to the place where defendant's station wagon had been parked. On the bank of the creek above the spot where the body was found were a cellophane-wrapped Capital's Palma cigar, a "Ballerina" brand ballpoint pen whose ink matched a stain on the pocket of the shirt defendant had worn Saturday, and an empty "Colt 45" stout malt liquor can, the same brand defendant had in his possession at the Abron home Saturday morning. The cigar was identical to two Capital's Palma cigars in cellophane wrappings found on the front seat of defendant's car when it was searched the next day.

From the foregoing evidence the jury could reasonably infer that defendant had discarded the "Colt 45" stout malt liquor can, and had inadvertently left the Capital's Palma cigar and the "Ballerina" ballpoint pen at the scene of the killing of Jeannine Abron on the Saturday morning in question. There was therefore substantial evidence to support the implied finding by the jury that defendant had taken Jeannine to the place where her body was discovered and killed her there.

Defendant also contends that the evidence is inadequate to sustain the jury's determination that the homicide was murder in the first degree. Section 189 of the Penal Code reads: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is commited in the perpetration or attempt to perpetrate . . . any act punishable under Section 288, is murder of the first degree. . . ." Section 288 of the Penal Code reads: "Any person who shall wilfully and lewdly commit any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child under the age of fourteen years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, shall be guilty of a felony. . . ."

Viewing the evidence in the light most favorable to the People, the first degree murder conviction could be sustained on either of two theories (1) a wilful, deliberate and premeditated killing or (2) murder which was committed in the perpetration or attempted perpetration of an act punishable under section 288.

There is ample evidence to establish that lewd acts were committed on the body of the victim. ▮ When last seen alive on Saturday morning, August 12, 1967, 8-year-old Jeannine was in good health without physical or mental impairment. She was dressed in a sweater, white underpants without rips or holes, and blue bermuda shorts, slightly split above the hem along the outside seams. Her nude body was found four days later floating in a creek. Her underpants, partly in the water of the creek, were torn at the crotch, and her blue bermuda shorts, completely torn across the crotch and along the sides of the legs, were hanging from branches on the bank. In the trees that overhung the body, newly-cut leafy branches had been placed to conceal the body from observation by occupants of light planes taking off and landing on the adjacent small-plane airfield runway. In the opinion of the autopsy surgeon, her left vulva had been injured.

These circumstances reasonably supported the implied finding by the jury that defendant had transported the victim in his car to the shrubbery along the bank of the creek to sexually molest her; that when she resisted his advances he tore away her shorts and underpants; and that to prevent her from telling her mother or the police what had happened defendant silenced her cries and threw her body into the creek. Seeking to prevent discovery of the body by overhead aircraft, he placed tree branches over the body.

Evidence of conscious guilt was shown by defendant's statements to Jeannine's mother shortly after 11 o'clock Saturday night that he had left Jeannine on the front porch of the Abron residence, when in fact he had not returned her to her home. About 2 o'clock Sunday morning defendant denied to police officers that he had driven Jeannine away in his station wagon, although eyewitnesses testified that he had. Shortly thereafter he denied to police that he had visited the Abron house on the morning in question and denied that Jeannine had been in his car that morning. In the presence of one of the officers, defendant stated that he was sorry that anything had happened to the missing little girl but that he had not seen her.

After hearing the officers' testimony, in which defendant had denied that Jeannine had been in his car, the jury heard defendant's testimony in which he admitted having visited the Abron house on Saturday morning, admitted that he had driven Jeannine to a nearby Safeway market, and admitted that he had left her there instead of returning her to her

home. The circumstances of defendant's conduct both before and after the disappearance of Jeannine, and the condition in which her body and torn clothing were found, warranted the jury in finding that the murder of Jeannine Abron occurred in the perpetration by defendant of lewd acts upon the body of the victim.

As an independent ground for sustaining the convic-- tion of first degree murder, the record supports the People's additional theory that the unlawful killing was deliberate and premeditated. Direct evidence of a deliberate and premeditated purpose to kill is not required; the elements of deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference. (*People* v. *Hillery, supra,* 62 Cal.2d 692, 703 [7].) Having ripped the clothing from her body, defendant purposefully murdered the child to prevent her from reporting the incident to her mother or to the police.

Fourth. *Did the trial court err in denying defendant's motion for entry of judgment of acquittal?*

*No.* Defendant contends that there is no proof that a criminal agency caused the victim's death and that the circumstances and conditions in the area where the body was discovered are consistent with an accidental death.

The criminal agency causing death may be proved by circumstantial evidence and the reasonable inferences to be drawn therefrom. (*People* v. *Cullen,* 37 Cal.2d 614, 624 [1] [234 P.2d 1]; *People* v. *Corrales,* 34 Cal.2d 426, 429 [3] [210 P.2d 843]; *People* v. *Ives,* 17 Cal.2d 459, 463-464 [2] [110 P.2d 408].) The corpus delicti was sufficiently proved where the evidence disclosed that an 8-year-old girl, in good health, left home at 10 o'clock in the morning and whose nude body was found four days later in a creek about four miles from her home. Leafy branches had been placed above the body to obscure its view. That force had been used to disrobe her was evident from the manner in which her shorts and underpants were ripped and the fact that the left side of her genitalia was bruised. The child could not swim, was not dressed for swimming, and carried no bathing suit. No reasonable inference could be drawn other than that her death was caused, not by an accident, but by a criminal agency.

At the close of the People's case, defendant moved for an acquittal pursuant to section 1118.1 of the Penal Code, which reads: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence

on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right.''

■ Without repeating the People's evidence, which has been set out above, it was not insufficient to sustain a conviction of murder, as charged, and the court did not err in denying defendant's motion for an order for entry of a judgment of acquittal.

■ Fifth. *Were the empty "Colt 45" malt can, cigar, and ballpoint pen found near the victim's body admissible in evidence?*

*Yes.* There is no merit to the contention that the above items had no relevancy to the People's case and were unconnected with defendant. Defendant was drinking a can of "Colt 45" stout malt and had two additional cans of the same brand with him at the Abron residence on Saturday morning. The Capital's Palma cigar was identical with two cigars found in defendant's station wagon the day after Jeannine's disappearance. A chemical test of the ink in the ballpoint pen showed that it was the same type as on an ink-stained pocket of the shirt defendant had worn on the morning of Jeannine's disappearance. The foregoing items, found on the bank of the creek near the victim's body, provided additional circumstantial evidence that defendant had been at that location on the morning of the victim's disappearance when witnesses observed his car parked in the shrubbery along Dry Crek.

■ Sixth. *Did the trial court abuse its discretion in admitting in evidence a color photograph of the victim's partly submerged body?*

*No.* The photograph is 3½ x 5 inches. The lower half of the photograph shows the dark green water of the creek and the upper half shows weeds and trees growing on the bank. The nude body, face down, occupies but a small portion of the photograph and is neither shocking nor gruesome. A number of other photographs of the area were introduced showing the victim's clothing hanging in the trees and shrubs, the matted-down grassy area where the malt can, cigar and pen were found, and the placement of cut branches above the body to

conceal it from view. The photographs, considered together, assisted the jury in relating the physical evidence to the area where the body was found. Under the circumstances, the trial court did not abuse its discretion in admitting the photograph over defendant's objection that the inflammatory effect on the jury would exceed its probative value. (*People* v. *Arnold,* 66 Cal.2d 438, 451 [11] [58 Cal.Rptr. 115, 426 P.2d 515] and cited cases.)

 Seventh. *Were defendant's extrajudicial statements to investigating officers properly admitted in evidence?*

*Yes.* Defendant contends that his statements to Officer Swars were inadmissible under the rules of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) The procedural safeguards require that "Prior to any questioning, the [accused] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." (*Ibid.*)

Contrary to defendant's assertion, he was neither in custody nor otherwise deprived of his freedom of action in any significant way when he was questioned by officers who were investigating a missing person's report. At approximately midnight on Saturday night, August 12, 1967, Officer Donald Swars of the Sacramento City Police Department, was directed by police car radio to investigate a report of a missing child. He understood this directive to mean that he was to find out where the child had been on Saturday and to find her. He had been informed that she had been with defendant on Saturday. Officers Swars and Walker interviewed Mrs. Abron, the child's mother, in front of the Abron residence. Accompanied by Mrs. Abron, the officers went to defendant's residence, but he was not there. They located his car parked on the street, and Mrs. Abron went into nearby bars in search of him. In the meantime the car had driven away, and the three searchers returned to defendant's residence. Not finding

defendant there, they went back to the Abron residence, where the officers obtained additional information for their written police report. Officer Swars told Mrs. Abron that the police department would continue searching for her daughter. The officers then reported to police headquarters that they were going to a nearby restaurant to have lunch. During their lunch, the officers received a phone call from headquarters that defendant had returned to his residence. Upon arriving there, the officers saw defendant in front of his residence talking with another unit of police officers, who left shortly after the arrival of Officers Swars and Walker.

Mrs. Abron was there and accused defendant of being responsible for her daughter's disappearance. Defendant asked the officers to keep Mrs. Abron away from him, and the officers told both defendant and Mrs. Abron that their arguing would not help the police in their efforts to locate Jeannine. Defendant told Officer Swars that he wanted to be helpful and would assist the police in their investigation; he said he was very sorry about the little girl but that he had not taken her from her home; he said he had not visited the Abron residence on Saturday morning; he had visited a house several doors away and had seen Jeannine playing with other children around his car but she had not been in it.

During his conversation with defendant, Officer Swars suspected that defendant may have been involved in Jeannine's disappearance, but he also felt that "there was nothing to go on" as a ground for taking defendant into custody because of the conflicting statements by Mrs. Abron that defendant had taken Jeannine in his station wagon Saturday morning and by defendant's denial that he had done so.

Defendant testified that Officer Swars said to him, in substance: "You know, the little girl is missing. . . . Now, at this point, I don't have too much reason to believe that anything really happened. We feel it is just a case where she hasn't come home. . . . You are not under arrest. But there will be additional officers . . . out to talk to you . . . [in] the next five or six hours. Please be available or let someone know if you go away from home any length of time."

Officer Swars did not intend to arrest defendant at that time, did not arrest him, and left him at his home after the conversation ended about 3 a.m. Defendant was arrested later Sunday morning about 10:30.

 The *Miranda* decision was "not intended to hamper the traditional function of police officers in investigating

crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.'' (384 U.S. at pp. 477-478 [16 L.Ed.2d at pp. 725-726].)

Custody is an essential element of the accusatory stage, and *People* v. *Furnish,* 63 Cal.2d 511 [47 Cal.Rptr. 387, 407 P.2d 299], cited by defendant, does not alter this rule. (*Ballard* v. *Superior Court,* 64 Cal.2d 159, 169 [13] [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) In *Furnish,* the defendant's 20-month-old child was found dead from asphyxiation. After the autopsy revealed that the child could have died when the defendant was at home, he was requested to go to the police station for questioning. After seven hours' questioning, without having been warned of his right to remain silent and to the assistance of counsel, he confessed, and it was held that his confession was improperly admitted even though he had not been formally arrested. By contrast, in the present case, at the time defendant was questioned the search for a missing child was just beginning, and there was no evidence that a crime had been committed.

*People* v. *Kelley,* 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947], cited by defendant, is likewise distinguishable. The accused was in the Navy and was told to report to the office of a naval criminal investigator for questioning regarding his alleged commission of lewd acts against a child and sex perversion. He was under military orders and reasonably believed that he was restrained by the military authorities during and after the interrogation. It was held that he was in custody and that his confession was erroneously admitted into evidence since he had not been adequately advised prior to interrogation by military authority of his right to counsel.

In the present case, the police sought out defendant in order to assist them in locating a missing child. He was questioned, not in an isolated chamber under psychological coercion, but in the familiar surroundings of his own front yard. Officer Swars testified that he did not go to defendant's home for the purpose of arresting him and believed that he had no adequate grounds for doing so. At the conclusion of their conversation, the officer left defendant at his residence. At the

time defendant was questioned at his home the police were engaged in a search operation for a missing child. Defendant's statements made at that time were lawfully obtained and therefore admissible. The paramount interest in locating the child justified the officers in not impeding their efforts by informing defendant of his right to remain silent and to the assistance of counsel. (*People* v. *Modesto*, 62 Cal.2d 436, 446 [5] [42 Cal.Rptr. 417, 398 P.2d 753].)

■■■ Eighth. *Do sections 190 and 190.1 of the Penal Code violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution because of lack of standards to guide the jury in its choice of a penalty for first degree murder?*

*No.* This argument was rejected in *In re Anderson*, 69 Cal.2d 613, 621-629 [73 Cal.Rptr. 21, 447 P.2d 117].

■■■ Ninth. *Did remarks made in the prosecutor's closing argument constitute misconduct?*

*No.* The prosecutor's statement, which defendant assigned as misconduct at the trial and on appeal was: "This little eight-year-old girl, whose clothes were ripped from her body, who was taken to this secluded location against the instructions of her mother by this man, she was killed in the course of a sexual attack. And even though three to four days had elapsed—actually, four days before the body was found, there still was evidence of that attack on the body, which was testified to by the autopsy surgeon." Defendant contends there was no evidence of a sexual attack.

■■■ The prosecutor may discuss the evidence and present to the jury his views of the proper deductions or inferences that the facts warrant. (*People* v. *Atchley*, 53 Cal.2d 160, 174 [14] [346 P.2d 764]; *People* v. *Burwell*, 44 Cal.2d 16, 39-40 [34] [279 P.2d 744].) ■■■ When asked if he observed some area of the victim's body on which force was applied, the pathologist testified that the fact that the left vulva was more swollen than the right and the discoloration was different from any other part of the body "suggested the probability of injury." Corroborating evidence of the prosecutor's inference that a sexual attack had been committed was the torn condition of the victim's shorts and underpants. The statement of the prosecutor was based on a reasonable interpretation of the evidence and was therefore within the scope of permissible argument.

■■■ Tenth. *Did the trial court err in denying defendant's motion to strike the testimony of Royden Hayer?*

*No.* At the close of the People's evidence, defense counsel moved to strike that part of Mr. Hayer's testimony in which he said that at 11:15 on Saturday morning, August 12, 1967, he heard a child's scream. The basis for the motion was that the testimony had no probative value and would tend to prejudice defendant's case.

Mr. Hayer operated a small-plane airport adjacent to the intersection of 10th and "G" Streets in Sacramento. On Saturday morning he was repairing an airplane wing in a workshop on the airport property in a southerly direction along Dry Creek from the place where Jeannine Abron's body was found. About 11:15 a.m. he heard a shrill cry like a child's frightened scream that ended abruptly. Fearing that someone had been injured by falling off a small dam across Dry Creek adjacent to his workshop and on property owned by him, he went outside to ascertain the source and cause of the scream. He was unable to identify the source of the scream and returned to his work. He further testified that, in his experience, human voices carry great distances along the waters of Dry Creek. The distance from the dam to the point in Dry Creek where the victim's body was later found was estimated to be about 1,000 feet. Mr. Hayer's direct evidence that he heard a child's scream, considered with the testimony of other witnesses, was relevant in the chain of circumstances tending to prove that Jeannine was with defendant when his car was seen parked in the shrubbery along Dry Creek on Saturday morning between 11:30 and 1 p.m. From this evidence the jury reasonably inferred that the frightened scream heard by Mr. Hayer was that of Jeannine just before she was murdered. Mr. Hayer's testimony was admissible, and defendant's motion to strike was correctly denied.

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied July 23, 1969.