## No. 22183.

ERNEST HOWARD PINE *v.* THE PEOPLE OF THE
STATE OF COLORADO.

(455 P.2d 868)

Decided February 24, 1969.    Rehearing denied July 14, 1969.

Ben Klein, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, Paul D. Rubner, Assistant, for defendant in error.

*En Banc.*

Mr. Chief Justice McWilliams delivered the opinion of the Court.

·Ernest Howard Pine, hereinafter referred to as the defendant, was convicted by a jury of the crime of second degree murder and as a result of this conviction he was sentenced to a term in the state penitentiary. By writ of error the defendant now seeks reversal of the judgment and sentence thus entered.

· In our view the basic issue to be resolved is whether the evidence is legally sufficient to support the verdict of the jury, namely, that of second degree murder,

coupled with the related issue as to whether it was error to submit to the jury for its consideration verdicts relating to first degree murder. Resolution of this phase of the controversy requires a consideration of the evidence adduced upon trial.

The undisputed evidence is that Fred Ralph Vigil and the defendant were involved in a barroom fracas, with the testimony as to just how the affray came about being in dispute. The People's evidence disclosed that immediately before the altercation between the defendant and Vigil, who were apparently total strangers, the latter was playing pool in the back of John's Lounge at 919 Santa Fe Drive, in Denver, Colorado and the defendant was in the forepart of the lounge enjoying a Saturday's afternoon beer with some of his friends. It would appear from the record that Vigil was a bit noisy to the end that the defendant remonstrated with him; whereupon Vigil responded that "he didn't have to shut up for him [the defendant] or anyone else." With that, the defendant was said to have rushed Vigil, hitting him in and about the face with his fists and pushing him rather forcefully into the brick wall. Vigil dropped to the floor and, according to several of the witnesses, the defendant then jumped upon the unconscious Vigil and proceeded to bounce Vigil's head on and off the concrete floor about three times. The defendant was said to have then fled the scene.

The defendant's version of what happened was quite different from the evidence offered by the People. The defendant testified that Vigil had made some uncomplimentary remarks to him and had raised his pool cue as if to strike him. Defendant said he then simply pushed Vigil away, whereupon Vigil fell to the floor. The defendant denied striking Vigil, or slamming him into the wall or bouncing his head on the concrete floor.

In any event, Vigil died about one week after the affray. The evidence revealed that after Vigil regained consciousness he left the lounge and returned to his

home. His wife testified, over objection, that when her husband arrived home he stated that he had a headache, and wanted to go to bed. The following day an osteopathic physician examined Vigil, who was still complaining of headaches, and this doctor prescribed certain medication. When Vigil did not respond to such medication he was then admitted one day later to a hospital for more detailed examination. As a result of certain spinal fluid tests this particular physician testified that he found blood in the spinal fluid which suggested brain injury. A neurological surgeon was then immediately called into the case and he testified that he examined Vigil and a day or so later operated upon Vigil in an effort to evacuate a collection of blood and fluid from the right side of the brain. The operating doctor "thought" his patient was going to recover but testified that Vigil's condition thereafter "deteriorated rather suddenly" and that he died in the early morning of March 14.

As concerns the cause of death, both the operating surgeon and the doctor who subsequently performed the autopsy testified that Vigil had in fact sustained a fracture of the skull resulting in an injury to his brain from which death ensued.

Upon trial, as is indicated above, the jury was instructed as to both murder in the first and second degree, as well as to voluntary and involuntary manslaughter, and forms of verdicts on each of these four grades of homicide were submitted to the jury. The jury thereafter found the defendant guilty of second degree murder. It is counsel's position that the evidence does not support this verdict of the jury and in this same general regard it is also alleged that the trial court erred in even submitting the issue of first degree murder to the jury.

It is quite true that ordinarily a mere blow with the fist does not imply malice or an intent to kill. *Smith v. People*, 142 Colo. 523, 351 P.2d 457 and *McAndrews v. People*, 71 Colo. 542, 208 P. 486. However, this is not a hard and fast rule. Depending upon the circumstances,

an assault with only the hands or feet may support a conviction of murder in the second degree. *Balltrip v. People*, 157 Colo. 108, 401 P.2d 259 and *Milosevich v. People*, 119 Colo. 56, 199 P.2d 895.

It is well to note, however, that ours is not just a case where the defendant struck Vigil with his fists. If that were the situation, then it might well be argued that under the authorities cited the conviction for murder would have to be reversed. But in the instant case there was much evidence that as Vigil lay unconscious on the floor, the defendant jumped astride of him and bounced Vigil's head on and off the *concrete* floor about three times. This is far different from a mere blow with the fist. If, for example, the defendant had struck the unconscious Vigil on the head with a chunk of concrete, it could not be seriously argued that malice could not be implied therefrom. And in our view the same result should prevail when the defendant smashed Vigil's head against the concrete floor, not once, but several times. Under such circumstance we deem the evidence sufficient to support the verdict of the jury and to also warrant submission to the jury of murder in the first degree.

It is next contended that the conviction must be reversed because of improper cross-examination of a character witness called in behalf of the defendant. Upon direct examination this witness testified that in his opinion the defendant had a good reputation for being a law-abiding citizen. Upon cross-examination the district attorney inquired as to whether the opinion of the witness would be the same if he knew of certain arrests and convictions the defendant had previously suffered. Counsel objected and when specifically pressed by the trial court as to the basis for the objection, he simply replied: "No proper foundation."

In this Court it is argued that the "form" of the cross-examinating question was improper and not within the rule of *People v. Futamata*, 140 Colo. 233, 343 P.2d 1058 and *Brindisi v. People*, 76 Colo. 244, 230 P. 797. In those

cases we approved the "Have you heard" form of cross-examining question for character witnesses. In the instant case, the district attorney prefaced his cross-examining questions put to defendant's character witness with the phrase, "Would your opinion be the same?"

█ It should be noted that counsel upon the trial of the case did *not* object to the *form* of the questions put to defendant's character witness. Nor was this particular matter contained in defendant's lengthy motion for new trial. Such being the state of the record, the question of form cannot be raised for the first time in this Court. To permit such a bootstrap operation would clearly offend the "contemporaneous objection" rule referred to in *Lucero v. People*, 158 Colo. 568, 409 P.2d 278 and *Brown v. People*, 158 Colo. 561, 408 P.2d 981. The wisdom of this rule is believed to be apparent. Had counsel, for example, objected to the form of the question and directed the trial court's attention to the *Futamata* and *Brindisi cases*, no doubt the trial court would have ordered the district attorney to rephrase his questions and bring them into line with those decisions. But not having made any objection upon trial to the form of the questions, counsel should not now be permitted to obtain a reversal of the conviction on the ground that the form of the cross-examining questions was faulty.

█ Finally, it is asserted that the conviction should be reversed because of the reception into evidence of what is claimed to be improper hearsay evidence. In this connection error is predicated on the following bits of evidence which were received, over objection:

(1) testimony of a Dr. Conyers concerning certain X rays of Vigil's head, the doctor testifying that the X rays were taken by a lab technician (who was not called as a witness) but under his direction and in his presence;

(2) testimony of the wife that when Vigil came home after the assault he complained of a headache and desired to go to bed;

(3) impeaching testimony of a police officer as to a con-

versation he had with one of the defendant's witnesses; and

(4) rebuttal testimony of a police officer as to an unsigned *statement* given him by the defendant.

Without going into unnecessary detail, we perceive no error as concerns the contention that hearsay evidence was improperly received into evidence.

The judgment is affirmed.