Jess ALCALA, Appellant (Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 3873.

Supreme Court of Wyoming.

June 29, 1971.

Rehearing Denied Aug. 2, 1971.

John E. Stanfield, of Smith & Stanfield, Laramie, for appellant.

James E. Barrett, Atty. Gen., Richard A. Stacy, Frederic C. Reed, Asst. Attys. Gen., Cheyenne, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN, and GRAY, JJ.

Chief Justice McINTYRE delivered the opinion of the court.

Jess Alcala has appealed to this court from a conviction of manslaughter in connection with the death of his wife, Emma Alcala.

Counsel for the defendant concedes a person accused of crime cannot ordinarily expect a perfect trial. He also concedes most of his many assignments of error do not involve major error. He says, however, even if we do not find any one thing sufficient to constitute reversible error, we should consider that an accumulation of all departures from a fair standard adds up to sufficient prejudice for reversal in this case.

Our review of the record convinces us that, on the whole, defendant had a fair trial and there was ample circumstantial evidence for a conviction of unlawful killing. Although the assignments of error are multitudinous, we need to take them one by one and point out why we consider them insufficient for reversal.

### Corpus Delicti and Connection of Accused with the Crime

■ We begin with the contention that the state failed to properly establish the corpus delicti for a homicide conviction. This will afford an opportunity for a brief review of the facts and will deal with what we understand to be one of appellant's major contentions.

Undisputed facts in the case reveal Mrs. Alcala disappeared from her home in Laramie and about thirty-six days later her body was discovered in Lake Sodergreen, approximately twenty miles southwest of Laramie. The body was wrapped in a tarp with rope tied around. Another rope connected the wrapped body of the deceased to a cement block. The block and body had been in the central part of the lake, but a current or some other force caused the body, with the block dragging, to be moved to a corner of the lake where it became partially exposed and was discovered.

We recognize proof of defendant's connection with the crime as the operative agent, although essential for conviction, is not part of the corpus delicti. 1 Wharton, Criminal Evidence, § 17 (12 ed.)

However, as stated in 23 C.J.S. Criminal Law § 916(4), p. 633:

"* * * the facts and circumstances from which the corpus delicti is proved may connect accused with the commission of the offense, and the same evidence which tends to prove the one also may tend to prove the other, so that the existence of the crime and the guilt of accused may stand together inseparable on one foundation of circumstantial evidence. * * *"

We think in this case some of the facts and circumstances are inseparable and they will therefore be discussed together.

There was evidence that Alcala and his wife had been having domestic troubles and a considerable argument the night she disappeared. On the morning before his wife's disappearance, defendant visited a neighbor lady, Ofelia Cortez, who testified Alcala stated:

"Well I am going to show her. Now, Ofelia, don't be surprised if you know when I am in jail, because when I catch up to her I am going to break every bone in her body. I will show her. I would have done this a long time ago, but I have got a lot of investment. I will show her and her cowboy friends."

There was testimony that the rope which connected the body of the deceased to the cement block was similar in color, composition, construction and diameter to two ropes found in the defendant's possession. These ropes were described as relatively unusual in type. The ropes found on the body of the deceased were not unusual in

type. They were, however, shown to be similar to rope in the defendant's possession.

There was evidence that Alcala owned a garbage trailer which was used for hauling trash. The trailer formerly had a tarp over it, but the tarp disappeared some time during the summer of 1969, when Mrs. Alcala was last seen alive. The defendant owned a boat and was known to make trips to Sodergreen Lake.

Although two days after Mrs. Alcala's disappearance the defendant stated to others he had notified police of the situation, it was ten days after her disappearance before he reported it. Also, two days after the disappearance, when riding in an automobile with a daughter, Alcala stated he thought he saw his wife's car, which also had been missing. The car proved to be where he said, but police testified he could not have seen it from the point where he supposedly saw it. A photograph was introduced in evidence to substantiate this theory.

A substantial part of the circumstantial case against the defendant consists of numerous untrue statements which he made to investigating officers concerning his actions around the time of his wife's disappearance. In several instances the police had learned facts from neighbors and other witnesses which made the defendant's first explanations suspect. The result was changes in the defendant's story.

The state considers particularly damaging to Alcala the fact that when questioned about a shovel, apparently for soil tests, he claimed he could not find his shovel. Afterwards he reported he had found it. Later it was proved and defendant admitted he had purchased the proferred shovel the night before at a second-hand store. He also then admitted that, before taking it to

the police, he "tried" it out in his back yard.

Appellant seeks to rely on State v. Osmus, 73 Wyo. 183, 276 P.2d 469, where proof was held insufficient to show that a newborn infant had not died of natural causes. There, however, the mother was unmarried and her pregnancy had not been known to her family and friends. Thus, the defendant-mother had reason to conceal the *birth* of the child, and under such circumstances proof that the body had been disposed of did not prove that its *death* was the thing being concealed. Proof was held insufficient in *Osmus* because criminal conduct cannot be attributed to nonfeasant acts of a mother during the travail of childbirth, even though the child should die. The principle has no application here.

In Bennett v. State, Wyo., 377 P.2d 634, 635, we said, to establish the corpus delicti in a prosecution for the killing of a newborn child these elements must concur: (1) That the infant was born alive; and (2) that death was caused by the criminal agency of the accused. With respect to homicide cases which do not involve the death of a newborn infant, this court indicated in State v. Lindsay, 77 Wyo. 410, 317 P.2d 506, 509, that proof of the corpus delicti consists of proof of the fact of death by the criminal agency of another.

It is indeed quite generally accepted that corpus delicti in the ordinary criminal homicide case consists of these two elements: (1) Death; and (2) the criminal agency of another as a cause.[1] In the *Bennett* case we said circumstantial evidence may be used to prove both the corpus delicti and the connection of the accused with a crime. In *Lindsay* it was said proof of the corpus delicti may be made by any legal evidence; and the best proof thereof is the finding and inspection of the dead body.

1. See People v. Cullen, 37 Cal.2d 614, 234 P.2d 1, 6; Romero v. People, Colo., 460 P.2d 784, 787; State v. Doyle, 201 Kan. 469, 441 P.2d 846, 853; State v. Hamilton, 1 N.C.App. 99, 160 S.E.2d 79, 81; Mayberry v. State, Okl.Cr., 449 P.2d 912, 914; State v. Fischer, 232 Or. 558, 376 P.2d 418, 419; The Corpus Delicti of Murder, 48 Va.L.Rev. 173; and VII Wigmore, Evidence, Section 2072, p. 401 (3rd Ed. 1940).

In this particular case, Alcala came to us after his preliminary hearing, on a petition seeking alternatively writs of habeas corpus, prohibition and certiorari. We denied the petition and stated:

"The file shows prima facie probable cause to believe that an offense has been committed and that defendant has committed it.

"There is no necessity for the State to negate all possible circumstances which might excuse or explain accused's conduct but is obligated to present only sufficient facts to support a reasonable inference of accused's guilt.

"It is not the purpose of the writs of habeas corpus, prohibition, or certiorari to interrupt orderly administration of criminal laws by a competent court acting within its jurisdiction."

The evidence adduced at defendant's trial, although circumstantial, was sufficient to establish the corpus delicti and defendant's connection with the crime so as to make a case for the jury. As stated in Murdock v. State, Wyo., 351 P.2d 674, 678, even where the evidence is entirely circumstantial, if it reasonably tends to prove the guilt of the accused, a verdict based thereon carries the same presumption of correctness as other verdicts and should not be disturbed unless wholly unwarranted.

Dr. Sakai, who examined the body of Mrs. Alcala, was of the opinion that the probable cause of death was asphyxia. While death by asphyxia is not necessarily caused by criminal agency, where there was a rather elaborate attempt to conceal the body by wrapping it and tying a cement block to it and depositing it in a lake, as in this case, there was sufficient evidence to warrant a conclusion that death was caused by criminal agency.

The facts in People v. Miller, 71 Cal.2d 459, 78 Cal.Rptr. 449, 459, 455 P.2d 377, 387, were similar to those in the case we are dealing with, in that there was an attempt to conceal the body and, because of decomposition, the pathologist was unable to reach a definite medical opinion as to the cause of death. In that case the Supreme Court of California held no reasonable inference could be drawn other than that death was caused, not by accident, but by a criminal agency. It stated: "The criminal agency causing death may be proved by circumstantial evidence and the reasonable inferences to be drawn therefrom."

### Search and Seizure

Officers had taken conflicting and untrue statements from the defendant concerning his wife's disappearance. Then, after viewing the body of the deceased and its wrappings at a funeral home, they determined Alcala should be arrested. It was in the evening, after the body was discovered, when officers went, without an arrest warrant or search warrant, to find and arrest the defendant.

Although appellate courts often reject contentions of a defendant that his constitutional rights have been violated, it does not mean shortcut and substandard procedures by investigating and prosecuting officials are recommended. Many times questions on appeal would be avoided if more care was exercised by these officials.

In this particular case, it can hardly be doubted that there was probable cause to believe defendant had committed a felony. Indeed, the legality of his arrest is not being challenged. This brings us then to a consideration of whether evidence obtained at the time of his arrest should have been excluded.

When two officers found and arrested Alcala, he was standing outside of his home, in the driveway and to the rear. When the arrest was made, one of the officers called the other officer's attention to a yellow nylon rope and a homemade hook which were lying on the ground about three feet from the defendant. According to the testimony, the rope was an uncommon type of rope but alike in color, composition, construction and diameter to the rope which had been used to connect the body of the deceased to a cement block.

We consider it well settled that objects falling into the plain view of an officer who has a right to be where he is are subject to seizure and may be introduced in evidence. Belondon v. City of Casper, Wyo., 456 P.2d 238, 241; Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067; State v. McMillan, 206 Kan. 3, 476 P.2d 612, 616.[2]

Appellant relies on Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 2041-2043, 23 L.Ed.2d 685, because it limits the extent of a warrantless search which is incident to a lawful arrest. There is nothing in *Chimel,* however, which suggests a limitation on the rule that evidence coming into plain view of the officer can be taken and used for evidence, when the officer makes a lawful arrest and is where he has a right to be. Indeed, *Chimel* seems to imply that evidence in plain view at the time and place of a lawful arrest may be seized.

Thus, the rope and hook which were lying on the ground, about three feet away, when Alcala was arrested, were properly taken by the officers and were admissible in evidence.

When the arrest was made, defendant's boat was on a trailer about ten feet away. It was open, with the cover folded and in the back of the boat. The officers looked in the boat. They also climbed into it and took possession of a number of articles for evidence. One piece of rope (Exhibit 26) was in a tool box. Except for it, there is no indication the items seized were not in plain view when the officers looked into the boat.

Although appellant complains that eleven items from the boat were seized, "including Exhibits 25 through 28," he does not attempt to show wherein any of this evi-

dence was particularly damaging. Apparently it was not all offered in evidence. Exhibits 25 through 28 are pieces of rope. None of them seem to have special significance—like the piece of yellow nylon rope found on the ground. As we view the record, Exhibits 25 through 28 were only cumulative in effect.[3]

In any event, there is one important difference between *Chimel* and Alcala's case. The search in the *Chimel* case was in the defendant's home. No authority is cited to show that limitations with respect to a search incident to a lawful arrest apply with the same force to a defendant's open boat.

Appellate courts, including ours, have long recognized a person's home is entitled to more sanctity and greater protection, when it comes to deciding what is a reasonable search, than one's boat or automobile. Gilkison v. State, Wyo., 404 P.2d 755, 757-758; Goddard v. State, Wyo., 481 P.2d 343, 344-345; State v. Blood, 190 Kan. 812, 378 P.2d 548, 555; United States v. One 1951 Cadillac Coupe, D.C.Pa., 139 F. Supp. 475, 477; and City of South Euclid v. Palladino, Ohio Mun., 193 N.E.2d 560, 564.

It is true, as we pointed out in both *Gilkison* and *Goddard,* more latitude is allowed in searching a vehicle or movable object because it can be quickly moved out of the locality or jurisdiction, making it impractical to obtain a search warrant. That is not to say there is no other reason for a distinction.

The Fourth Amendment of the federal constitution guarantees only against "unreasonable" searches and seizures. Hence, a search in one's home, as incident to a lawful arrest, might be unreasonable, while

---

2. For other cases see State v. Camper, Mo., 353 S.W.2d 676, 679; People v. Manzi, 38 Misc.2d 114, 237 N.Y.S.2d 738, 741; People v. Willard, 238 Cal.App.2d 292, 47 Cal.Rptr. 734, 743; and State v. Allred, 16 Utah 2d 41, 395 P.2d 535, 537.

3. It is stated in 5A C.J.S. Appeal & Error § 1731, p. 1012, the admission of improper

and objectionable evidence is harmless error where the fact thereby sought to be shown is fully and clearly established by other evidence which is competent. Under note 7, a host of cases is cited in support of the statement. The principle is applicable insofar as Exhibits 25 through 28 in Alcala's trial are concerned.

a similar search made in an open boat mounted on a movable trailer might not necessarily be adjudged unreasonable.

In a decision subsequent to the *Chimel* decision, in Chambers v. Maroney, 399 U. S. 42, 90 S.Ct. 1975, 1979–1981, 26 L.Ed.2d 419, it was held the search of an automobile without a warrant, as incident to a lawful arrest, was not unreasonable or unlawful. In that case there was no danger of the vehicle being moved out of the locality or jurisdiction because the arresting officers had taken it into custody. The court said, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant.

Alcala's attorney suggests an officer could have stood guard over the boat here involved, while the other officer went and obtained a search warrant. However, in *Chambers,* the court said, for constitutional purposes, it saw no difference between on the one hand seizing and holding the car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. The court concluded: "Given probable cause to search, either course is reasonable under the Fourth Amendment." [4]

In the absence of authority that the search of something comparable to an open boat on a trailer is unreasonable, when such search is incident to a lawful arrest, we will not pretend to extend the scope of the holding in *Chimel* by applying its limitations to the boat in this case.

Therefore, we must reject appellant's contention that Alcala's rights under the Fourth Amendment were violated by the search immediately following his arrest.

### Hearsay

Appellant contends he was denied due process of law because hearsay evidence was admitted at his trial. This question is first raised in connection with the testimony of the pathologist who performed the autopsy on the body of Mrs. Alcala.

The doctor testified he sent tissue samples to the FBI laboratory "to check whether there was any poison or barbiturates or anything which can be the cause of death." He was asked at the trial about the result of the examination and the defense objected because the witness had not himself performed the examination and his knowledge was based on hearsay. The trial judge overruled the objection stating, doctors are an exception with respect to the hearsay rule; and experts use the medical services of others.[5]

The portion of the FBI report to which the pathologist, Dr. Sakai, referred related only to routine findings, i. e., factual matters. It expressed no opinion. Moreover, the FBI technician who made the tests and prepared the report subsequently testified. He was cross-examined extensively by counsel for the defense. Thus, defendant was not denied the right of confrontation, and he was not prejudiced by having the pathologist express an opinion based in part on the tests of the FBI.

Another ruling complained of has to do with the court permitting, over the

4. In the *Chambers* opinion the court quoted from and followed Carroll v. United States, 267 U.S. 132, 69 L.Ed. 543, 45 S.Ct. 280. Then, in footnote 8 in *Chambers* it was stated, nothing said last term in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, purported to modify or affect the rationale of *Carroll.* Of course the rationale of *Carroll* is applicable to Alcala's boat because it was in close proximity to the arrest; it was movable because it was on a trailer; and the contents of the

boat could be readily disposed of by members of the defendant's family or other persons.

5. Cases which hold an expert may express an opinion based on facts testified to by another expert or upon tests made by other experts include: Christiansen v. Hollings, 44 Cal.App.2d 332, 112 P.2d 723, 731; Pine v. People, 168 Colo. 290, 455 P.2d 868, 870–871; and State v. Coltharp, 199 Kan. 598, 433 P.2d 418, 424.

objection of defendant, testimony by Mrs. Cortez concerning a conversation with Mrs. Alcala during the afternoon before Mrs. Alcala's disappearance. Mrs. Cortez testified:

"* * * I told her how mad and concerned Jess was about her and that he had threatened her, and she said 'This is not the first time; he has done this for years.'"

A general rule is stated in 22A C.J.S. Criminal Law § 742, pp. 1103–1104, to the effect that declarations of the victim, which are not offered as proof of the truth contained therein, but as evidence of the fact that they were made, thus exhibiting a condition of mind, have been held to be admissible. As observed in 6 Wigmore, Evidence, p. 57 (3 ed.), statements of a person's own mental condition have long been the subject of an exception to the hearsay rule.[6]

The witness who testified concerning the declaration of Mrs. Alcala is the same witness who testified that defendant had on the same day threatened to break every bone in the victim's body. According to the witness, she told Mrs. Alcala about this threat, and it was only proper for the court to receive evidence which tended to show the mental state or condition of mind of Mrs. Alcala when she learned of the threat.

We have said the statement attributed to Mrs. Alcala denotes ill feeling and hostility. We fail to see in it anything damaging to the defendant except that it would tend to prove motive and malice, which would be essential for a conviction of second degree murder.

Inasmuch as the state was trying Alcala on a charge of second degree murder, it was entitled to offer evidence of motive and malice. It was expressly held in Romero v. People, Colo., 460 P.2d 784, 788, that in marital homicide cases any fact or circumstance relating to ill-feeling, ill-treatment, jealously, prior assaults, personal violence, threats, or any similar conduct or attitude by the husband toward the wife are relevant to show motive and malice in such crimes.

The case of State v. Kump, 76 Wyo. 273, 301 P.2d 808, 817, was like the Alcala case. There the court dealt with what was considered hearsay testimony concerning statements made by the decedent in her lifetime. The defendant was charged with second degree murder and convicted of manslaughter. The court held, in view of the fact the defendant was convicted of manslaughter only, the admission of hearsay evidence of threats and hostility, all showing malice, was not reversible error.

■ The death certificate for Mrs. Alcala was received in evidence despite an objection by defendant that the exhibit contained a number of conclusions which were for the jury. There was no hearsay objection, but appellant now contends the exhibit constituted obvious hearsay evidence.[7]

Section 35–48, W.S.1957, provides that properly filed death certificates "shall be prima facie evidence of the facts therein stated." Also, the coroner who made the death certificate testified at Alcala's trial and was subject to cross-examination by counsel for the defense. Thus, defendant was not denied his right to be confronted by the witness and to cross-examine.

In Capes v. State, Okl.Cr., 450 P.2d 842, 845, the introduction of a death certificate was held not to be prejudicial error, even though the person who executed it did not testify and apparently no statute autho-

---

6. Case authority for this rule includes: Hutchins v. State, Wyo., 483 P.2d 519, 521; Bustamonte v. People, 157 Colo. 146, 401 P.2d 597, 601; People v. Matlock, 51 Cal.2d 682, 336 P.2d 505, 510, 71 A.L.R.2d 605; Lowrey v. State, 87 Okl. Cr. 313, 197 P.2d 637, 651; and Sapp v. State, 87 Tex.Cr.R. 606, 223 S.W. 459, 468.

7. In State v. Moore, Wyo., 356 P.2d 141, 144, it was held an argument on appeal that a question called for hearsay may not be heard when such objection was not interposed at the trial.

rized its admission. In Alcala's case, Wyoming does have a statute authorizing acceptance of the death certificate as evidence, and the maker of the certificate testified. See Claim of Hill, Wyo., 451 P.2d 794, 796.

Finally, as far as hearsay is concerned, appellant claims it was error to permit a detective to testify concerning the results of his investigation which involved the questioning of various individuals. We fail to find any basis in the record for such a claim.

Specifically, the argument under this point is that Mrs. Alcala had been involved with an individual identified as David Clark (although counsel says there may be some uncertainty as to the last name), in fact had been drinking with an individual named "David" the night she was allegedly killed, that this individual was not called as a witness and that improper testimony was elicited from a detective concerning his talking with a "David Egman." The detective had testified that he had contacted Mr. Egman with the idea of the possibility of obtaining information about the activities of Mrs. Alcala on July 4, 1969. Asked, "And—did your investigation reveal anything of significance or helpful in that regard," objection was made that this asked for hearsay. The objection was overruled and the witness answered, "No, it did not." We do not agree this constituted hearsay evidence; but in any event, the matter does not warrant discussion since defendant has neither presented authority nor cogent argument on this point.

### Colored Photographs

Appellant contends it was error to admit Exhibits 18 and 19, which were colored photographs of Emma Alcala's body; and that this violated Alcala's rights under the due process clauses of the federal and state constitutions.

We repeated in Dickey v. State, Wyo., 444 P.2d 373, 377–378, what had been previously held, that a trial court has a rea-

sonable discretion in determining whether photographs are unnecessarily gruesome and inflammatory. We also quoted from a previous case the following:

"* * * While some of these graphic depictions are not pleasant to look upon, and, in fact, are somewhat gruesome, we cannot say that they were not proper and necessary to be placed before the jury in order that they be enabled to get a proper perspective and an understanding of the testimonies that were given in connection with them. * * *" [8] State v. Alexander, 78 Wyo. 324, 324 P.2d 831, 837, certiorari denied 363 U.S. 850, 80 S.Ct. 1630, 4 L.Ed.2d 1733.

With respect to Alcala's trial, it appears the state had eight colored photographs of decedent's body which, despite defendant's objection, were approved by the trial judge, before trial, for admission at the trial. Only five of these were offered at the trial, and three of them were excluded subject to further connection. The state made no further effort to introduce any of the three. Thus, only Exhibits 18 and 19 went to the jury.

We find no abuse of discretion in admitting the two photographs in question. It would appear it was proper and necessary for them to be shown to the jury in order for it to get a proper perspective and understanding of testimonies that were given relative to the condition in which the body was found. Of course, it was not possible to show the body itself. If it had been, the result would doubtless have been more gruesome.

### Instructions

Appellant claims on appeal that he was denied due process and a fair trial because of erroneous instructions which were given; and because of a refusal of instructions requested by defendant. In considering this claim, we confine ourselves to specific assignments of error listed in appellant's statement of points. We will not pretend to prosecute an independent search

---

8. Cases are cited in the *Dickey* opinion which have made similar pronouncements.

of all the instructions for some error upon which appellant could possibly rely.[9]

■ The first assignment in connection with the instructions is that the court erred in giving Instruction No. 5, as follows:

"The rule which clothes every person accused with crime with the presumption of innocence, and imposes upon the State the burden of establishing their guilt, beyond a reasonable doubt, is not intended to aid any one who is in fact guilty of crime to escape, but is a humane provision of law, intended, so far as human agencies can, to guard against the dangers of any innocent person being unjustly punished; but the jury may well remember that to establish the guilt of a defendant beyond all reasonable doubt is not meant that such guilt shall be established to an absolute certainty. Absolute certainty in the establishment of any fact is rarely attainable and never required in courts of justice."

This same instruction was approved by us in Kennedy v. State, Wyo., 470 P.2d 372, 376, reh. den. 474 P.2d 127. However, at the time appellant's brief was served a rehearing was being considered in the *Kennedy* case. Our holding was being reexamined in the light of a decision in Colorado, in Martinez v. People, Colo., 470 P.2d 26.

Subsequently, the rehearing was denied in *Kennedy*, and we ruled again on the same instruction in Carrillo v. State, Wyo., 474 P.2d 123, 126, where we stated:

"Even though we have again fully considered all of the reasoning and arguments underlying the divergent views, we remain unpersuaded that our holding in *Kennedy* was incorrect in view of the abundance of authority supporting it, and as a consequence the contention here made with respect to the use of the phrase under discussion * * * is rejected."

9. See Spriggs v. Copenhaver, Wyo., 459 P.2d 203.

Without pretending to advise trial courts with respect to use of the instruction being considered, we simply repeat that we are still unpersuaded that its use is erroneous.

■ The second assignment of error with respect to the instructions is that, considered in their entirety, the instructions unfairly emphasized and erroneously stated principles of law to an extent and in a light highly favorable to the prosecution and extremely prejudicial to the defense.

Of course, we cannot pass upon assignments of error which are stated in such general and broad language as this one is. We will say our review of the instructions as a whole convinces us they were fair and impartial, without favor or prejudice to either side in the case.

Except for the citation of authority on such general propositions as the need for instructions to be impartial and not to strongly present the theory of one side and minimize that of the other side, appellant cites no authority to support his contention of partiality to the prosecution. We presume counsel found no case or authority to support his contention that the instructions on a whole unfairly emphasized principles in a light favorable to the state.[10]

■ Counsel for appellant does ridicule and complain bitterly against Instruction No. 17 pertaining to circumstantial evidence. The instruction reads:

"Circumstantial evidence is proper and competent to prove the commission of an offense. That is to say, the facts surrounding the commission of a crime may be proved and if these facts are of such a nature and so connected with each other and with the defendant and with the crime alleged that they can not be explained upon any reasonable theory excepting that of guilt of the defendant, then they are sufficient to warrant a verdict of guilty.

10. This presumption is warranted under the authority of Drummer v. State, Wyo., 366 P.2d 20, 26; and Valerio v. State, Wyo., 429 P.2d 317, 319.

"Circumstantial evidence appeals to the common sense and common experience of mankind. These teach us that the known existence of some facts necessarily implies that other facts connected therewith exist. If you awake after a night's sleep and find the sun shining, you know the sun arose in the morning though you did not see it rise. If you find the whole earth drenched with water, you know that rain has fallen, though you did not see or hear it rain. Or if you find footprints on the snow you know that some person or animal has been there and also which it was, though you see nothing but the tracks. If you find a tree shattered in a particular way, you know that it has been visited by lightning. Sometimes circumstantial evidence is even more convincing than direct evidence, because direct evidence may depend upon the memory and observation and truthfulness of one witness, while circumstantial evidence may be supported by the testimony of several witnesses to facts which concur and agree or upon physical facts which can not be mistaken or can not speak falsely.

"But to warrant a conviction on circumstantial evidence each fact necessary to the conclusion of guilt must be proved beyond a reasonable doubt, and all the facts so proved must be consistent with each other and with the main fact sought to be proved, and the circumstances, taken all together, must be of a conclusive nature and producing in effect a reasonable and moral certainty that the accused, and no other person, committed the offense charged. The mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction. They must be such as to create and justify full belief according to the standard rules of certainty. It is not sufficient that they coincide with and render probable the guilt of the accused. The facts so proved must be incompatible with innocence and incapa-

ble of explanation upon any other reasonable theory than that of guilt."

This instruction would not be our choice for an instruction on circumstantial evidence. But that is not to say it was prejudicial in any respect to the defendant. A jury of average intelligence can understand a simple instruction on circumstantial evidence when one is deemed necessary or desirable. Examples of circumstantial evidence, like the ones used in this instruction, would hardly seem necessary. However, it would be difficult to speculate as to which side, if either, is benefited or hurt by the examples. We can see the possibility of a defense attorney pointing to this instruction and arguing: It is incumbent upon the state to prove its case to the point that guilt of the defendant is as clear as the rising of the sun in the sky.

Suffice it to say appellant has not shown us any persuasive reason or authority for holding the defendant prejudiced by Instruction No. 17, or any other particular instruction.

■ The third assignment of error having to do with instructions is that the defendant was entitled to instructions setting forth his theory of the case and the evidence.

We agree a defendant is indeed entitled to have the jury instructed on his theory of the case. We so held in Blakely v. State, Wyo., 474 P.2d 127, 129. However, there must first be competent evidence tending to substantiate defendant's theory. This is implicit in what we said in *Blakely* and also in what was said in State v. Hickenbottom, 63 Wyo. 41, 178 P.2d 119, 127–131.

In Groom v. State, Okl.Cr., 419 P.2d 286, 291–292, it was stated:

"Where the trial court has instructed within the law and evidence thus established, it is neither the court's duty nor its right to instruct on speculative theories of counsel unsupported either by the evidence or the law."

The same court had previously held, in Fennell v. State, Okl.Cr., 396 P.2d 889, 891, that it is not error to refuse to give a requested instruction in the absence of any substantial evidence to support the giving of the same.

In Colorado, pronouncements have been made to the effect that the trial judge must give an instruction tendered by a defendant on his theory of the case *only* when there is evidence to support the defendant's theory. Land v. People, Colo., 465 P.2d 124, 125–126.[11]

We have searched the record diligently in the case before us, and we can find no defense theory except a plea of "not guilty" and Alcala's claim that "he didn't do it." He did not testify at the trial; and no evidence was offered on his behalf which would establish a different theory of defense. The instructions given appear to be quite complete and adequate to cover a general denial of guilt.

■ Appellant makes only a casual and general statement in his brief to the effect that the court rejected his various tendered instructions relative to burden of proof, the effect of the evidence, the effect of circumstantial evidence, and the fact that defendant did not have to present any evidence. We find these matters adequately covered in the instructions which were given and we assume appellant has no specific complaint or assignment with respect to such matters.

■ There is a specific complaint because the court did not instruct on corpus delicti. The court's position was that the jury ought not be burdened with the term.

In People v. Lawrence, 133 Cal.App. 683, 284 P.2d 949, 950–951, cert. den. 350 U.S. 997, 76 S.Ct. 549, 100 L.Ed. 862, reh. den. 351 U.S. 921, 76 S.Ct. 712, 100 L.Ed. 1452, the court dealt with a contention that the trial court erred in failing to instruct the jury on the element of corpus delicti. The comment of the court was, the expression means nothing more than "the body of the crime" which in plain English, when related to a charge of burglary, means an unlawful entry. No error was found.

In State v. Andrus, 250 La. 765, 199 So. 2d 867, 881–882, it was considered well settled that to obtain a conviction in a criminal case the state must prove the corpus delicti, or the fact that a crime has been committed. However, the appellate court observed that the judge in general instructions to the jury charged that it was incumbent on the state to prove the offense charged to the satisfaction of the jury beyond a reasonable doubt. The conclusion was: "This was a charge to the jury that the State had to prove the corpus delicti, that is, that the offense of theft had been committed."

In Alcala's case the trial judge adequately charged the jury that it was incumbent on the state to prove the offense charged to the satisfaction of the jury beyond a reasonable doubt. This necessarily means the state had to prove death as a result of the criminal agency of another. It was not necessary to use the term "corpus delicti." We agree with the trial judge that it was not necessary for the jury to be burdened with the term.

■ Appellant has made a rather general assignment by saying the trial court erred in rejecting "the many" instructions requested by defendant which were correct statements of the law, were applicable to the facts in the case, and represented a theory of the defense. Of course, it is not error for the trial court to refuse to give a requested instruction, even if it states a correct principle applicable to the case, if the matter has been covered properly and sufficiently by other instructions given.

That seems to be the situation in this case. We will not pretend to discuss individually each of "the many" instructions requested on behalf of the defendant which were not given. Suffice it to say we have

11. See also Sterling v. People, 151 Colo. 127, 376 P.2d 676, 678, cert. den. 373 U.S. 944, 83 S.Ct. 1554, 10 L.Ed.2d 699.

reviewed them carefully and find no cause for reversal in connection with their refusal.

■ There is a contention that the court should not have defined the term "reasonable doubt," as done in Instructions 4 and 6. Although some courts have held that reasonable doubt needs to be defined and that it is fundamental error not to do so,[12] in this jurisdiction we have said several times that the term need not be defined,[13] inclining toward the view that a trial court would be well-advised to avoid instructions on reasonable doubt, but as observed in State v. Robinson, 235 Or. 524, 385 P.2d 754, 756, attempts to define the term are not error merely because a definition is not necessary.

Insofar as Alcala's appeal is concerned, we are left with these considerations: (1) Are the instructions erroneous; (2) are they sufficiently prejudicial to defendant that a new trial must be ordered; and (3) were the objections made at the time of trial sufficient to point out wherein and why the defendant was erroneously prejudiced?

We find nothing in either of the reasonable doubt instructions which could be prejudicial to the defendant. Also, we find nothing in the objections made at trial which were sufficient to point the trial court to any harmful or prejudicial effects of such instructions. There were general objections that the instructions were contrary to law, erroneous, redundant and misleading.

An objection which merely says an instruction is contrary to law or erroneous or redundant or misleading is not good without it being pointed out wherein and why it is contrary to law or erroneous or redundant or misleading. See Drummer v. State, Wyo., 366 P.2d 20, 23–24; and State v. Chambers, 70 Wyo. 283, 249 P.2d 158, 162.

■ Before leaving the matter of instructions we need to comment on appellant's claim that the court erred by giving Instructions 23 and 25. These instructions stated:

### "INSTRUCTION NO. 23

"It is the duty of each juryman, while the jury is deliberating upon their verdict, to give careful consideration to the views his fellow-jurymen may have to present upon the testimony in the case. He should not shut his ears and stubbornly stand upon the position he first takes, regardless of what may be said by the other jurymen. It should be the object of all of you to arrive at a common conclusion and to that end you should deliberate together with calmness. It is your duty to arrive upon a verdict, if that is possible.

"You are instructed, however, that if any one of the jury after having considered all the evidence in this case, and after having consulted with his fellow-jurymen, should entertain a reasonable doubt of the defendant's guilt, then the jury cannot find the defendant guilty."

### "INSTRUCTION NO. 25

"I believe it is my duty to remind you that this trial has, as a matter of course,

---

12. Williams v. U. S., C.A.N.C., 271 F.2d 703; Com. v. Farst, Pa.O. & T., 9 Lebanon 330; Com. v. Schuck, 401 Pa. 222, 164 A.2d 13; and Com. v. Itterly, Pa.Quar.Sess., 61 Lack.Jur. 81.
Several cases have come out of Oklahoma, where the Criminal Court of that State held it is erroneous to attempt to define reasonable doubt. The matter was subsequently put at rest, however, in Young v. State, Okl.Crim., 373 P.2d 273, 278, when that court expressly said it would carefully examine the instruction on rea-

sonable doubt with reference to the whole record; and if it should appear the effect was not one of injury to the defendant, the court would not reverse the cause solely on the basis of such instruction.

13. State v. Goettina, 61 Wyo. 420, 158 P.2d 865, 882; Claussen v. State, 21 Wyo. 505, 133 P. 1055, 1056, affirmed on rehearing 135 P. 802; State v. Eldredge, 45 Wyo. 488, 21 P.2d 545, 547–548; and State v. Velsir, 61 Wyo. 476, 159 P.2d 371, 377–378.

been attended with large expense to the parties, and that you should make every effort to agree. To aid you in the consideration of the case, I instruct you that although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his fellow jurors, yet in order to bring twelve minds to a unanimous result, you must examine the question submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided; that you are selected in the same manner and from the same source from which any future jury must be selected; and there is no reason to suppose that this case will ever be submitted to twelve men and women more intelligent, more impartial, or more competent to decide it; or that more and clearer evidence will be produced on the one side or the other, and with this in view, it is your duty to decide the case, if you can conscientiously do so."

Alcala's attorney claims the two instructions together amount to an "Allen" charge. We considered the so-called Allen instruction in Elmer v. State, Wyo., 463 P.2d 14, 20–21. It is true Instruction No. 25 appears to contain a portion of the language which was used in the Elmer case. It does not contain all of it. Instruction No. 23 may have something of the same purpose but different language.

In our opinion the two instructions, as given in Alcala's trial, are definitely more favorable for the defense than was the single instruction, as given in Elmer. Moreover, in Alcala's case, both instructions were given along with other instructions in the case and at the same time. Whereas, in the Elmer case the Allen charge was given after the jury was reported in disagreement.

The portion of the Allen charge which was given in the Elmer trial and omitted in Alcala's trial has been said to carry an implication that the minority should yield to the opinion of the majority. It is clear, however, that no such implication can be attributed to the instructions in Alcala's trial.

We are unpersuaded that our ruling with respect to the Allen charge was wrong in Elmer. It therefore follows, a fortiori, that we cannot condemn the two instructions in this case, which counsel claims amount to an "Allen" charge.

### Leading Questions

It is charged on appeal that the defendant's right to a fair trial was violated by consistent use of leading, suggestive and improper questions by the prosecution; that the trial court failed to take affirmative action in this regard; and that there were many erroneous evidentiary rulings by the trial court.

We find this to be another general and vague assignment of error which appellant has not substantiated. As we view the record, it simply does not reflect unusual or prejudicial irregularities in trial procedures of the nature asserted.

It is difficult to ascertain specifically what appellant's contentions are in this assignment. No authority is cited in support of any specific argument. Appellant, under this assignment, makes no affirmative showing of error, and he has not attempted to establish prejudice. We will not pretend to make an independent inquiry of our own to find some possible error in the field suggested for our search.

### Defendant's Statements

With reference to two statements which had been obtained from the defendant prior to the discovery of Mrs. Alcala's body and defendant's arrest, he argues that as a general rule where the State introduces in evidence the confession of an accused it is bound by exculpatory portions therein unless they are shown by the evidence to be untrue, insisting that the exculpatory portions of his statements were not proven to be false, and citing 23 C.J.S.

Criminal Law § 842, p. 293. He also points out that in Texas and Oklahoma it has been held that where the prosecution uses a statement of the accused which is both inculpatory and exculpatory the trial judge is obligated to instruct the jury that the defendant is entitled to acquittal unless the exculpatory portions are disproved. In our view defendant's position is without merit since, as shown by the authority on which he relies, falsity of exculpatory statements may be shown by circumstantial evidence; and in the instant situation his general denial of having anything to do with the death of his wife was discounted by the presentation of such evidence.

We are aware of the holdings by the Texas court, adopted in Oklahoma, as to the obligation of a court to instruct concerning exculpatory statements, which matter has been the subject of Annotation, 116 A.L.R. 1459. However, such rule has lacked acceptance elsewhere. State v. Casaus, 73 N.M. 152, 386 P.2d 246, 248; State v. Parker, 33 N.J. 79, 162 A.2d 568, 575. Moreover, counsel's reference to instructions on this subject seems to be thrown in merely as a matter of emphasis since no request was made for an instruction on the subject as required under Rule 31, W.R.Cr.P.

### Sufficiency of Evidence

The final argument made on behalf of appellant is that a judgment of acquittal should have been entered because the evidence was insufficient to sustain a conviction.

We have already pointed out, in connection with our discussion about proof of the corpus delicti, that the evidence was sufficient to establish the corpus delicti and to make a case for the jury. We see no reason to say more on that subject. There was ample evidence, even though circumstantial in nature, to support the verdict of the jury.

### Conclusion

We are unpersuaded that any one shortcoming here constitutes reversible error.

It may be that reversal could be required in a case where there is a series of errors, no one of which is sufficiently prejudicial alone. However, that could occur only when the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial. Such a situation is not borne out by an analysis of the record in this case. As we said at the outset, our review of the record here convinces us that, on the whole, defendant had a fair trial and there was ample circumstantial evidence for a conviction of manslaughter.

Affirmed.

GRAY, Justice (dissenting).

The all-important question and issue in this case is the defendant's contention that the State failed to prove by sufficient evidence the corpus delicti. If there is merit in that contention, and I am persuaded that there is, the conviction cannot stand.

As a general proposition, while we have been less than consistent with respect to the elements that must be established in order to prove the corpus delicti, I agree with the majority that the almost universally accepted rule is to the effect that it consists of (1) death and (2) the criminal agency of another. We adhered to that rule in the early case of Dalzell v. State, 7 Wyo. 450, 53 P. 297, 298. It must also be proved beyond a reasonable doubt. Bennett v. State, Wyo., 377 P.2d 634, 635. I agree also that such proof may be made by direct or circumstantial evidence or by a combination of the two and in unusual circumstances proof of the corpus delicti is often interwoven and considered with that connecting the accused with the crime. Markoff v. State, 52 Wyo. 457, 75 P.2d 773, 778. That case, however, is not as broad as the rule stated in 23 C.J.S. Criminal Law § 916(4), upon which the majority relies, which to me because of the circumstances here has no application inasmuch as the State's own evidence which fixed the cause of death as probable asphyxia brought about a separation in its proof. Evidence of death by any other

cause was foreclosed and as shall be pointed out the pieces of evidence upon which the State relies were of little probative value in establishing that the asphyxia resulted from a "criminal agency." In addition, an examination of the cases shown in the footnotes as supporting the rule almost without exception dealt with cases wherein there were extrajudicial confessions or admissions to corroborate the proof pertaining to criminal agency. Here there was no extrajudicial confession or admission of the guilt of the defendant.

Other than the limitation of the order of proof laid down in Konopisos v. State, 26 Wyo. 350, 185 P. 355, 356, that extrajudicial confessions or admissions "should not be allowed to go to the jury until other evidence sufficient to go to the jury on the question of the corpus delicti has been introduced by the state," such order of proof is largely discretionary with the trial court. Where as here, however, the State relies entirely upon circumstantial evidence which it contends established the "criminal agency," such proof must be clear, convincing and competent, sufficient to exclude uncertainties beyond a reasonable doubt. It cannot be established by speculation, suspicion, surmise or guess, State v. Osmus, 73 Wyo. 183, 276 P.2d 469, 484; or even upon probabilities, Smith v. State, 40 Wyo. 128, 274 P. 1074, 1079; State v. Rideout, Wyo., 450 P.2d 452, 454–455.

It is also well recognized that the establishing of the corpus delicti will not be presumed, State v. Doyle, 201 Kan. 469, 441 P.2d 846, 860–861; 23 C.J.S. Criminal Law § 916(2), p. 626; and the presumption is that the death resulted from innocent, noncriminal causes, Reyes v. State, 151 Neb. 636, 38 N.W.2d 539, 544.

With the foregoing concepts in mind, I will comment briefly upon the evidence which the State asserts established the corpus delicti.

Turning first to the probative value of the purported threat of violence to the decedent made by the defendant several hours before the alleged time of death, it is a well recognized rule that such threats, although competent on the issue of malice or intent, are not admissible or competent in making proof of the corpus delicti. Decker v. Commonwealth, 278 Ky. 145, 128 S. W.2d 600, 602; 40 C.J.S. Homicide § 201, p. 1102.

With respect to the evidence relating to the concealment of the body, it is true, of course, many cases are to the effect that this is a strong incriminating circumstance along with other facts in the case. See Annotation 2 A.L.R. 1227 and the later cases as disclosed by the Later Case Service. A review of those cases, however, will disclose that with few exceptions the corpus delicti was established by other evidence and the ultimate issue reduced itself to the identity of the accused as the criminal agency. Notwithstanding the rule in other jurisdictions, we viewed such evidence as a "suspicious circumstance" in the case of State v. Osmus, supra, 276 P.2d at 477–478, and held that it did not prove that the death was caused by criminal agency.

The fact that the defendant failed for several days to notify the police of the disappearance of the decedent, which perhaps may also be regarded as a suspicious circumstance, is of little if any probative value inasmuch as the delay is explained to some extent by the State's evidence and there was no legal duty imposed upon the defendant to report the matter to the police.

That defendant may have lied to the police with respect to the incident concerning the shovel might well have had a direct bearing upon the defendant's credibility had the defendant taken the stand. However, it had no probative value on the matter under discussion so far as I can determine and the State's argument does not inform or enlighten me.

Reverting now to the State's theory that the probable cause of death was asphyxia, the State in its brief concedes that its medical testimony did not prove "the criminal agency associated with the death," and consequently I do not dwell upon the testi-

mony of Dr. Sakai except to say that it by no means excluded the admitted fact that asphyxia could result from many causes, natural and unnatural, innocent or criminal, and could result by someone placing a pillow over the nose of decedent, of which there was no proof; or on the other hand by a person rendered unconscious by alcohol or a combination of barbiturates and alcohol who somehow got a pillow under the nose. In this connection the State's evidence without contradiction shows that decedent was intoxicated on several occasions, had been drinking shortly before the claimed time of death, and also that decedent had barbiturates in her possession.

Another infirmity in the State's proof of criminal agency is that it builds inference upon inference in order to sustain its claim and this cannot be done. Tate v. People, 125 Colo. 527, 247 P.2d 665, 672; Hartman v. State, 185 Tenn. 350, 206 S.W.2d 380, 385; Foster v. State, 180 Tenn. 164, 172 S.W.2d 1003, 1006. There is no direct evidence that the defendant concealed the death of his wife by placing the body in the lake. The State contends it was proved by the circumstantial evidence tending to show that the rope binding the body was alike in color, composition, and size to rope found in defendant's possession; that the body was wrapped in a tarpaulin and defendant at one time had a tarpaulin for his trailer which had not been seen by a neighbor that summer; an inner wrapping of a quilted pad which could have come from a warehouse connected by a door to defendant's barbershop; and that defendant had a boat and was seen on the lake the day the body was discovered. From this the jury would first have to draw an inference that defendant owned or obtained the wrappings found on the body; then an inference based upon that inference that he placed the body in the lake; and then an inference upon those inferences that the death resulted from criminal agency by the placing of a pillow over the nose and mouth of the decedent. Certainly such evidence was wholly insufficient to prove criminal agency and did not meet the presumption that the death resulted from innocent, noncriminal causes.

Cases dealing with death caused by asphyxia are few and far between, but as indicated above such cause of death was before us in the Osmus case, which I have already mentioned, and in the three cases of Coca v. State, Wyo., 423 P.2d 382; Lujan v. State, Wyo., 423 P.2d 388; and Borrego v. State, Wyo., 423 P.2d 393. In those last three cases there was medical testimony that the asphyxia was "due to vomitus in the breathing airway and that vomiting might be caused by extreme emotional disturbance, trauma, disease, or certain other circumstances." Coca v. State, supra, 423 P.2d at 383. It will be noted that we did not accept such medical testimony standing alone as establishing the cause of death. Nevertheless, in view of the evidence of the violence perpetrated upon the body of the deceased, we held there was sufficient evidence to justify a finding that the vomitus was caused by such violence. Here, of course, just as in the Osmus case, there was no evidence of violence. I realize, of course, that the majority attempts to distinguish the instant case from the Osmus case but to me the effort is not convincing. The critical question there of the failure of the State to prove the criminal agency it undertook to prove is identical to the critical question in the instant case.

From the foregoing I can only conclude that the holding of the majority to the effect that the attempt to conceal the body, together with the testimony that the death was caused by asphyxia, was sufficient to meet the burden of the State to prove criminal agency beyond a reasonable doubt is, in order to meet the exigencies of this case, the adoption of rules which are contrary to the rules we have heretofore observed and prescribed. I say this for the reason that in support of its determination it cites People v. Miller, 71 Cal.2d 459, 78 Cal.Rptr. 449, 455 P.2d 377, 387. California appears to be at least one state that has departed from the requirement that the corpus delicti be established "beyond a rea-

sonable doubt." In that state all that is required is for the State to make out a prima facie case "that the deceased met his death by means of an unlawful act of another," People v. Ives, 17 Cal.2d 459, 110 P.2d 408, 411; or as stated in People v. Small, 7 Cal.App.3d 347, 86 Cal.Rptr. 478, 482, to establish a "reasonable probability that the criminal act of another was the cause of death."

Also bearing upon this matter is a recital by the majority from an order entered in an original proceeding here wherein the defendant sought relief from a determination by the justice of the peace that there was probable cause for requiring defendant to answer and defend the criminal charge in the district court. I fail to see the significance of that. Under Rule 7(b), W.R. Cr.P., the commissioner may require an accused to answer and defend an accusation in the district court if it appears "that there is probable cause to believe that an offense has been committed and that the defendant has committed it." To me there is a substantial difference between the State's burden to produce evidence sufficient to support a determination of "probable cause to believe" and the burden cast upon the State in the trial to prove beyond a reasonable doubt not only the death by criminal agency but the identity of the accused as the criminal agent. In any event, the order also recites that the matter was not considered "in depth" and the paramount reason for summarily denying the petition was the impending trial within a very few days.

Additionally, of course, the function of the trial court in assessing the sufficiency and probative value of the evidence at the trial is entirely different from the function of the commissioner at the preliminary hearing. At the trial stage the State must meet its burden of proving the corpus delicti beyond a reasonable doubt and if the evidence offered in proof thereof is not sufficient affirmatively to establish by clear and convincing evidence that death resulted from the criminal agency of another it is the trial court's duty to so hold

and to dismiss the information. State v. Doyle, 201 Kan. 469, 441 P.2d 846, 858; Azbill v. State, 84 Nev. 345, 440 P.2d 1014, 1018.

It may be that this case demonstrates a need for reexamination of previous holdings of this court on the question of the proof necessary to establish the corpus delicti and the adoption of a broader concept than has heretofore been taken. To do so other than prospectively, however, it seems to me results in a manifest injustice for the reason that the trial strategy of counsel for defendant in not putting the defendant on the stand and in not presenting evidence was predicated upon his insistence that the State had failed to meet its burden of establishing the corpus delicti under legal principals to which we have adhered.

The error with respect to proof of the corpus delicti was compounded by the refusal of the trial court to instruct on corpus delicti. I disagree with the majority's view that it was unnecessary to give such an instruction. As I previously stated, the State's proof of the corpus delicti was the all-important question and issue in this proceeding. The trial court gave as its reason for denying the instruction requested by defendant that it would only confuse the jury to undertake to instruct on the "technicalities associated with corpus delicti." While we have not heretofore passed upon the precise question, the prevailing rule is to the contrary.

4 Warren on Homicide, § 322, pp. 23–24 (Perm.Ed.), says:

"The court should charge the jury that proof of the corpus delicti is essential to the conviction of defendant, and that this must be proved beyond any reasonable doubt, and that this is the rule whether the evidence is direct and positive or merely circumstantial. * * *"

See also 41 C.J.S. Homicide § 355, p. 122. In the early case of Territory v. Monroe, 2 Ariz. 1, 6 P. 478, 479, it was said:

"* * * It would be folly to argue that a conviction for murder could be sustained when the *corpus delicti* is not

proven. It was a question which it was the duty of the jury to pass upon, and if not proven, it was their duty to acquit, and it was the duty of the court to so charge them, and the refusal of the request to make such charge was manifest error."

Pumpkin v. State, Okl.Cr., 295 P.2d 819, 825, flatly says, "The court should have clearly defined the meaning of corpus delicti." Where, as here, the trial court and this court were fully aware of the defendant's contentions throughout the proceedings and the State's proof of the corpus delicti was indeed questionable, the least that should have been done if the case was to go to the jury was to give a careful and specific instruction with respect to the corpus delicti. The general instructions did not purport to cover this critical issue. In this connection I might say it seems quite inconsistent to me for the majority to accept the proposition that to use the term "corpus delicti" in an instruction would only confuse the jury and then condone the giving of at least three separate instructions on the meaning of reasonable doubt, which we have unequivocally denounced in the four cases cited in footnote 13 of the majority opinion as tending to confuse the jury for the reason that the term carries its own definition. Under our previous pronouncement it was prejudicial error for the trial court on its own volition to give all of those instructions.

Perhaps I need not extend this opinion further but I do not concur in the intimation that Dr. Sakai was free to use the FBI report as a basis for his opinion without its being in evidence, Lujan v. State, supra, 423 P.2d at 392, and which was not prepared under his supervision and direction. Neither do I concur in the discussion concerning the admissibility of a statement assertedly made by decedent to Mrs. Cortez the day before Mrs. Alcala's disappearance. It is contrary to what was said concerning such statements in State v. Kump, 76 Wyo. 273, 301 P.2d 808, and in fact was double hearsay, People v. Lew, 68 Cal.2d 774, 69 Cal.Rptr. 102, 441 P.2d 942, 944.

With respect to Instruction 17, I would agree that had the second full paragraph thereof not been given it would appear not to have been harmful to the defendant. However, the State fails to point out the source thereof and I take it cannot do so. It seems clearly erroneous to me. It may be possible, of course, as the majority says that it could benefit an accused in an argument to the jury but defendant's criticism that "The Court might just as well have added a fifth example: 'If you find a woman's body wrapped in a tarpaulin, weighted by a cinder block and floating in a lake, you know she was murdered by her husband though you did not see the blow struck or hear her scream of pain and horror'" would seem to be just as reasonable and more probable. There is at least a doubt as to whether or not it was prejudicial and that doubt should be resolved in favor of the defendant.

Also, in connection with circumstantial evidence the trial court by Instruction No. 18, after stating that such evidence should "exclude every reasonable hypothesis consistent with innocence," went on to say that it was unnecessary "that it should dissipate mere conjectures and speculative doubts, for metaphysical and demonstrative certainty is not essential to proof by circumstances." From what followed, the thrust of that language might not have been harmful but under the circumstances of the case it seems to me it was prejudicially erroneous for the court not to have given at defendant's request the instruction set forth in Osmus, 276 P.2d at 483–484, which was said to be "highly and peculiarly appropriate in a case such as that at bar." The instruction was in keeping with and particularly pertinent to defendant's defense that the State had failed to prove the corpus delicti.

With respect to Instructions 23 and 25, I would agree, if it were not for the errors discussed above, that the giving of these two instructions was not so prejudicial as to necessitate reversal. Although it is true that these instructions eliminated some of the language of the Allen Instruction,

which was before us in Elmer v. State, Wyo., 463 P.2d 14, and which was given as a supplemental instruction, it can hardly be questioned that the tenor and purpose of Nos. 23 and 25 was to get before the jury other ingredients of the Allen Instruction which mounting authorities condemn as being coercive and erroneous. It seems to me that the caveat we gave in Elmer against future use of such instructions, whether original or supplemental, was made clear but apparently it has not been so understood. I would now make it clear beyond question that henceforth instructions such as Nos. 23 and 25, even though containing some language not subject to criticism, should not be given and will not be condoned.

For the foregoing reasons I would hold that the trial court erred in denying defendant's motion for judgment of acquittal and reverse the judgment.

## ON PETITION FOR REHEARING

## BY THE COURT.

Petition for rehearing having been filed by appellant, and petition for stay of execution having also been filed by appellant, with a request that, in the event a rehearing is denied, then and in that event a stay of execution be granted for sufficient time for appellant to petition the United States Supreme Court, in *forma pauperis*, to grant a writ of certiorari; such petitions having been duly considered; and it having been determined that the petition for rehearing is without merit in that the points raised were carefully and fully considered by the court in the disposition heretofore made; but that appellant's request for stay of execution should be granted:

It is ordered that the petition for rehearing be and the same is hereby denied.

It is further ordered, however, that appellant, Jess Alcala, be and he is hereby granted a stay of execution for a period of six months from the date hereof, or until the United States Supreme Court has acted unfavorably in regard to appellant's petition for writ of certiorari, in the event of such action before six months from the date hereof, conditioned upon appellant's appearance bond in the amount of $15,000 being kept in full force and effect throughout such stay of execution.

GRAY, J., dissented in the original opinion and would grant the petition for rehearing.